HOWARD BOLLMEIER et al., Plaintiffs-Appellants, v. FORD MOTOR COMPANY et al., Defendants-Appellees.

(No. 69-142;

Fifth District—November 25, 1970.

Sam Pessin, of Belleville, for appellants.

Oemke, Dunham, Boman & Leskera, of East St. Louis, (Allen D. Churchill, of counsel,) for appellees.

Mr. PRESIDING JUSTICE MORAN delivered the opinion of the court:

Plaintiffs appeal from a judgment of the Circuit Court of St. Clair County entered upon an allowance of defendants' motion for directed verdicts made at the close of the plaintiff's evidence.

This action in strict liability was brought by Howard Bollmeier for damages to his automobile and by Gary Bollmeier, a minor, by Howard Bollmeier, his father and next friend, for personal injuries sustained when his father's 1966 Thunderbird automobile driven by Gary left the road and was involved in a one-car accident allegedly caused by the failure of the automobile to steer properly because of alleged defects in the automobile. Defendant Ford Motor Company is the manufacturer and defendant Donald Riess, d/b/a Riess Ford Sales, hereinafter "Riess," is the dealer from whom the automobile was purchased.

Plaintiffs' multiple count complaint contains allegations of negligence and breach of implied warranty against both defendants.

The evidence shows that the accident occurred on Saturday evening, July 9, 1966. Gary Bollmeier, then 20 years of age, was driving his father's 1966 Ford Thunderbird. About seven o'clock he drove from his home in Marissa to Lenzburg, approximately four miles northwest on Route 13, where he went to a picnic. It was cloudy and he left after about 45 minutes. He had had nothing alcoholic to drink. He made a left turn from Main Street in Lenzburg onto Route 13, a paved two-lane highway, and proceeded toward New Athens. He had his seat belt fastened and was alone in the car. Approximately one mile from Lenzburg he approached a moderate curve to the left traveling at 45 to 50 miles per hour. He slowed his speed to about 45 miles per hour to make the curve. It

had started to rain very slightly and he had both hands on the wheel. He testified, "I was following the road, steering normally, turned to the left as the road would go, and as I was going into the curve, the car didn't respond to my normal turning and I turned the wheel some more. The car continued straight on, off the road, and after I noticed it wasn't turning, wouldn't respond to my turning of the steering wheel, I applied the brakes and my front wheels went off the road and my car continued off the road into a creek." He had traveled about seventy feet on concrete on the curve and did not apply his brakes until he started to leave the pavement. He stepped on the power brake as hard as he could and the wheels locked as the car traveled approximately 150 feet over hard sod into a creek embankment. There was testimony that the wheel tracks left in the sod indicated that the wheels were not turned to the left, but were headed in the direction of the car. He suffered personal injuries to his chin and jaw and the evidence indicated that the car could not be repaired. At that time the car had approximately 4400 miles on it.

The car, a two-door hardtop with power-steering, power-brakes, automatic transmission and automatic speed control, was delivered to the Bollmeiers early in April, 1966. From the time it was delivered the Bollmeiers observed a vibration which could be seen and felt in the steering column and the steering wheel. They also heard a humming noise which was described as similar to a swarm of bees or the sound of snow tires. Mr. Bollmeier testified that on the week-end after he took delivery his family drove to Carbondale, Illinois, a distance of approximately sixty miles, and by the time they arrived there they were practically deaf from the humming sound. On the following Monday they took the car back to Don Riess for the first time. Mr. Bollmeier testified that he could feel the vibrations in his hand on the steering wheel and he could also see it. Mrs. Bollmeier and Gary Bollmeier also testified to this vibration and humming sound. Mrs. Bollmeier testified that they had traded in another Thunderbird on this one, but had had no similar experience with it or any other car they had had. She knew this car was taken back to Riess's garage several times due to the vibration and no one at the garage told her not to drive it. Although vibration was always present when the car was driven, no one experienced any difficulty with the steering prior to the time of the accident.

Don Riess testified that he had sold the car to the Bollmeiers. It had been delivered by rail to St. Louis and by truck from St. Louis to Marissa. There were several minor problems with the car when it was delivered. It was losing power steering fluid and the car pulled hard either to the right or the left. He did not remember. These items were corrected. They

did not make a road test, but they followed the check list supplied by Ford Motor Company. They found no other problems with the car. A few days after delivery Mr. Bollmeier brought the car back, complaining of the vibration sound. Riess rode in the car with Mr. Bollmeier and agreed that the vibration was like a humming or the sound of a swarm of bees or like snow tires. He changed the tires but this did not correct the problem. He admitted that the problem actually existed. They then turned the driveshaft a quarter or half of a turn as they did on the 1965 Fords when they had a similar vibration problem. Ford had suggested this solution when he called them. They changed the wheel bearings and found scratches on the bearings and races, but none of these changes corrected the problem. He then contacted the Ford garage in Clayton, Missouri, for help in diagnosing the problem. A service representative, Robert Thomas, recommended that a new driveshaft be installed. When the bearings in the car were changed, it had 342 miles on it and at that time it was necessary to clean and dress the spindle on the steering wheel and the differential was checked and indicated presence of a noise.

Sometime after the accident some persons from Ford Motor Company removed the power steering pump and the steering gear box for testing. None of the Bollmeiers made a close inspection of the steering mechanism prior to this time, but when the wrecker raised the front of the car someone observed that the wheels responded to the turning of the steering wheel. No one observed a visible defect in the steering mechanism.

James W. Kitchen testified under Section 60 of the Civil Practice Act that he works for Ford Motor Company and is in charge of testing and evaluation of components. He examined the power steering pump on this particular vehicle but was in charge only of this component. He discovered no defect and had no knowledge of any defect in any of the other parts which they removed. He testified that it was possible that a certain vibration or force over a certain period of time could break large pieces of metal. This would not happen unless there was tension or some force applied to the metal. He knew that certain vibrations could cause the loosening of bolts in an automobile. He also had first hand knowledge that a bolt will break as a result of vibration from another part to which it is attached or shear off as a result of fatigue. He also testified that if there is an imbalance in the motor it will show up as a vibration in another part of the automobile, and if something in the automobile was out of balance, it would cause a continual vibration throughout the automobile. It would be a logical sequence that certain other parts would either be loosened or could be caused to break. The loosening or breaking of a bolt in the steering mechanism could bring

about the losing of control over the steering mechanism, but he was not aware of any missing or broken bolt in this particular steering mechanism.

Plaintiffs' counsel attempted to qualify Mr. Bollmeier as an expert so that he could give his opinion as to the cause of the steering failure in the car. Bollmeier is presently president of Bollmeier Construction Company which does industrial work with heavy equipment machinery of all types. He has been in the business of machinery for the past twenty-five years. He spent ten years as a Master Mechanic for United Electric Coal Company and there was in charge of all trucks, tractors, cars, heavy stripping equipment and draglines. He has personally engaged in the repair and checking of trucks and cars and personally takes charge of his own equipment to see that repairs which are needed are made. His knowledge of power steering components is based upon what he has done with other equipment that he has owned and worked on. He has never personally worked with a Ford power steering mechanism but has done work with Chrysler products. Ford's expert, James Kitchen, testified that steering mechanisms are basically the same. Mr. Bollmeier's testimony indicates that he is quite familiar with the steering mechanism involved.

Plaintiff's counsel posed a hypothetical question to Mr. Bollmeier, based on prior testimony and asked if he had an opinion as to the cause of the failure of the steering mechanism. Defendants objected and the trial court sustained the objection on the basis that Bollmeier was not qualified and had not inspected the steering mechanism in question.

On appeal plaintiffs contend that it was error for the trial court to sustain the objection to plaintiffs' hypothetical question and to direct a verdict for defendants at the close of plaintiffs' evidence.

Defendants contend that the rejection of expert testimony based on the hypothetical question was vested in the wide discretion of the trial court and is not error unless that discretion is abused.

■■ First, it is well established that an expert, if qualified, may give an opinion based on a hypothetical question and without personal knowledge of the facts. *Gillette v. City of Chicago*, 396 Ill. 619. Second, we believe that the trial court abused its discretion in rejecting the opinion of the witness and that his opinion is a matter of credibility for the jury and could be rebutted by defendants' proof.

In *Mahlstedt v. Ideal Lighting Company*, 271 Ill. 154 at 177, the Illinois Supreme Court said:

"Expert evidence is admissible when the witnesses offered as experts have peculiar knowledge or experience not common to the world, which renders their opinions founded on such knowledge or experience

an aid to the court or jury in determining the question at issue. Expert testimony is proper when the subject matter of the inquiry is of such a character that only persons of skill or experience in it are capable of forming a correct judgment as to any fact connected therewith."

Although he had never worked on a Ford Thunderbird steering mechanism, he had worked on and was quite familiar with other automobile power steering components as well as other hydraulic equipment, and the expert from defendant Ford testified that these steering mechanisms are basically the same.

■■ We believe the witness was shown to have sufficient experience and knowledge with respect to automobiles and other types of equipment to qualify as an expert. See also *Henningsen v. Bloomfield Motors Inc.*, 161 A.2d 69, and *Moren v. Samuel M. Langston Co.*, 96 Ill.App.2d 133.

The trial court granted defendants' motion for a directed verdict on plaintiffs' negligence counts. Under the evidence we hold that the court acted properly in so doing.

The trial court also directed a verdict in favor of the defendants on the warranty counts. The basis of the trial court's ruling was, and the thrust of defendants' argument on appeal is, that the plaintiffs were required to prove a specific defect in the product in the warranty counts, and that they have not sustained this burden by proving a defect in the steering mechanism or in the automobile which caused the injuries.

The issue then is whether in a suit for breach of implied warranty or strict tort liability it is necessary to prove the specific defect in the product which caused the injury either by direct or circumstantial evidence.

The requirements for a products liability case were established in *Suvada v. White Motor Company*, 32 Ill.2d 612 at 623:

"The plaintiffs must prove that their injury or damage resulted from a condition of the product, that the condition was an unreasonably dangerous one and that the condition existed at the time it left the manufacturer's control."

This language does not indicate that proof of the specific defect which causes the product to be in an unreasonably dangerous condition is necessary. In *Dunham v. Vaughan and Bushnell Mfg. Co.*, 42 Ill.2d 339, where the contention was made that the testimony of the experts showed that the hammer which chipped and caused the injury contained no defect, our Supreme Court discussed the requirement of a "defect" at 342-43:

"Although the definitions of the term 'defect' in the context of products liability law use varying language, *all of them rest upon the common premise that those products are defective which are danger-*

*ous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function.* So, Chief Justice Traynor has suggested that a product is defective if it fails to match the average quality of like products. (Traynor, The Ways and Meanings of Defective Products and Strict Liability, 32 Tenn. L. Rev. 363 1965).) The Restatement emphasizes the viewpoint of the consumer and concludes that a defect is a condition not contemplated by the ultimate consumer which would be unreasonably dangerous to him. (Restatement, Torts (Second) Sec. 402A, comment g.) Dean Prosser has said that 'the product is to be regarded as defective if it is not safe for such a use that can be expected to be made of it, and no warning is given.' (Prosser, The Fall of the Citadel, 50 Minn. L. Rev. 791, 826.) Dean Wade has suggested that apart from the existence of a defect 'the test for imposing strict liability is whether the product is unreasonably dangerous, to use the words of the Restatement. Somewhat preferable is the expression "not reasonably safe." ' (Wade, Strict Tort Liability of Manufacturers, 19 S.W. Law Journal 5, 15.) See also, Dean Keeton, Products Liability—Liability without Fault and the Requirement of a Defect, 45 Tex. L. Rev. 855, 859." Emphasis Added.

The leading case of *Henningsen v. Bloomfield Motors, Inc., supra,* is strikingly similar to the instant case. The proof consisted of testimony of the plaintiff-driver that she was traveling in the right hand lane when she heard a loud noise "from the bottom by the hood." It "felt as if something cracked." The steering wheel spun in her hands and the car veered sharply to the right and crashed into a highway sign and brick wall. No other vehicle was involved and the damage to the car was so great that it was impossible to determine if any of the parts of the steering wheel mechanism or workmanship or assembly were defective prior to the accident. An insurance carrier's inspector with eleven years of experience testified that the accident must have been due to mechanical defect or failure. On this evidence the Supreme Court of New Jersey upheld the trial court's dismissal of the plaintiff's count on negligence for failure to make out a *prima facie* case but upheld the submission of the case to the jury on the theory of breach of implied warranty, even though the court noted that the opinion of the expert produced by plaintiff was not entitled to much probative force. That court stated, "In our view the total effect of circumstances shown from the purchase to accident is adequate to raise an inference that the car was defective and that such condition was causally related to the mishap." 161 A.2d 69 at 97.

Finally, in *Greco v. Bucciconi Engineering Company,* 283 F.Supp. 978, aff'd. 407 F.2d 87, the court faced the issue "does the mere occurrence of a malfunction by machinery evidence a 'defective condition'

within the meaning of Section 402A of the Restatement." The plaintiff's injury resulted from an alleged malfunction of certain industrial machinery supplied by defendants. Plaintiff did not attempt to trace the malfunction to any particular component of the machine nor did he seek by testimony, expert or otherwise, to offer a theory for the malfunction. The court noted that absent evidence of a specific defect the plaintiff fails to establish a cause of action in negligence. (*Vandercook & Son Inc. v. Thorp*, 322 F.2d 638.) The court went on to review the policy considerations for the different evidentiary requirements in negligence and strict liability at 980:

"Adopting the evidentiary requirements of warranty rather than negligence is supported by the nature of strict liability itself. The law of negligence is primarily concerned with the actor's conduct in terms of the applicable duty of care. Thus it is vital to trace the injury to some specific error in construction or design of the machinery to determine whether '* * * the accident * * * was one that could not have been avoided by the exercise of reasonable care * * *.'" Loch v. Confair, 93 A.2d 451, 454 (1953).

In contradistinction of the law of negligence, the law of warranty assigns liability on the basis of the product's lack of fitness. When machinery 'malfunctions', it obviously lacks fitness regardless of the cause of the malfunction. Under the theory of warranty, the 'sin' is the lack of fitness as evidenced by the malfunction itself rather than some specific dereliction by the manufacturer in constructing or designing the machinery.

As the substance of strict liability in tort is akin to that of the law or warranty, the evidentiary requirements to establish breach of warranty rather than those to prove negligence should prevail in an action in strict liability in tort.

In Pennsylvania, plaintiffs in actions for breach of warranty have regularly sought to establish the cause of the malfunction. [Citing Cases.] Yet, nothing in the opinions indicates that such evidence was the sine qua non for a verdict for plaintiffs.

In other jurisdictions, judgments for plaintiffs alleging breach of warranty have been sustained on evidence of malfunction alone. [Citing Henningsen v. Bloomfield, supra; Cordle v. Renault, Inc., 361 F.2d 332; Vandercook & Son Inc. v. Thorp, supra.]"

■■ Therefore, direct or circumstantial evidence which tends to prove that the product failed to perform in the manner reasonably to be expected in the light of its nature and intended function, such as proof of a malfunction which tends to exclude other extrinsic causes, is sufficient to make a *prima facie* case on this issue. And the rule in a products liability

case as to the proof of a defective condition within the meaning of *Suvada* and *Dunham* does not differ from the rule in other cases as established in *Lindroth v. Walgreen Company*, 407 Ill. 121 at 134, that "reasonable inferences may be drawn from established facts and all that can be reasonably required to establish controverted facts, whether the evidence be direct or circumstantial, is that the evidence creates a greater or less probability leading, on the whole, to a satisfactory conclusion."

In the present case there was substantial evidence that there was some malfunction in the car which manifested itself in a vibration in the steering. There was also expert testimony that this vibration could cause a metal failure or loosening of bolts which could occur in a steering mechanism. Although there was no prior complaint about the steering in the car as to its responsiveness, there was evidence by the driver that the car failed to respond when he attempted to negotiate a curve to the left. We believe that from the evidence submitted up to this point in the case, the jury could have properly concluded that the automobile failed to perform in the manner that would reasonably have been expected and that this failure caused the plaintiff's injury. The fact that someone turned the steering and the wheels responded when the car was hoisted from the ground is not conclusive on the issue of a defective condition, but was some evidence which could have been considered by the jury.

██ Accordingly, we hold that the trial court was correct in granting defendants' motion for directed verdict on the issue of defendants' negligence, but erred in the direction of a verdict on the issue of breach of implied warranty and the cause is remanded to the trial court for further proceedings not inconsistent with this opinion.

Affirmed in part, reversed in part and remanded.

EBERSPACHER and GOLDENHERSH, JJ., concur.