ARNOLD C. SAUGET, Plaintiff-Appellee, *v.* BEUCKMAN FORD, INC., Defendant-Appellant.

Fifth District   No. 78-85

Opinion filed December 18, 1979.

SPOMER, J., dissenting.

Allen D. Churchill, of Churchill, Nester & McDonnell, of Belleville, for appellant.

·C. E. Heiligenstein and Brad L. Badgley, both of Belleville, for appellee.

Mr. JUSTICE KASSERMAN delivered the opinion of the court:

On September 25, 1973, Arnold Sauget was injured when a dump truck bed, fully loaded with lime dust, fell on his right hand which was resting on the truck frame rail supporting the bed. Sauget brought an action based on strict liability in tort against Beuckman Ford, Inc., as seller of the truck, alleging that his injury was the result of a defective power take-off unit mounted on the truck which caused the bed to abruptly drop. A jury in the circuit court of St. Clair County returned a verdict in favor of Sauget in the amount of $63,000. Beuckman appeals the trial court's denials of its motions for a directed verdict and for judgment notwithstanding the verdict.

The evidence at trial shows that on the day of the mishap, Sauget was employed by the village of Cahokia as a laborer and was assigned to a

construction crew operating at a work site on Cooper Avenue in the village. At approximately 11 a.m. a dump truck loaded with lime dust arrived at the site. The driver, Joseph Howard, activated the power take-off unit of the hoist in an attempt to raise the truck bed and dump the load. However, after being raised only 12 to 18 inches the bed stopped and would go no further. Sauget was standing at the rear of the truck and was pulling on a rod attached to the dump box which freed the tailgate and allowed it to open as the bed rose. He then crawled beneath the driver's side of the truck behind the cab in order to see if anything was obstructing the hoist. While Sauget was in this position with his right hand on the truck frame rail for leverage, the bed fell down. Sauget testified that he did not touch any levers or switches while he was under the truck. When Howard became aware of Sauget's predicament, he pulled a hoist control cable knob and was able to raise the bed high enough for workers to extricate Sauget's hand.

The truck involved in this case is a 1973 Ford F-600 single axle, dump truck bearing a serial number whose last four digits are 0435 and which was purchased new from Beuckman by the village. The vehicle was equipped with a Daybrook hoist furnished and installed by Transportation Equipment Company of Vandalia, Illinois. The serial number of the hoist as shown in plaintiff's exhibit No. 16 is 161306.

Anthony Golec, a private investigator for Sauget's trial counsel, took statements from several occurrence witnesses, including Melvin Reagan, a superintendent for new construction projects for the village. Reagan's statement, Plaintiff's Exhibit No. 49, described the accident in the following manner:

> "The truck driver started to unload the load of lime dust and the dump bed raised up a little bit—no more than just three or four inches—and then hung there. There is a box with a manual trip on it right where the hoist is on the driver's right side of the dump bed and the foreman of the sewer department crew Arnold was working on said he would trip this manual trip to raise the dump bed and when he said, 'I'll get it,' Arnold said, 'Here, let me get it,' and Arnold climbed underneath the dump bed frame and hit this manual trip lever. When he hit the manual trip lever, the dump bed should have gone up but instead it went down on Arnold's hand * * * ."

In a report to Sauget's counsel, Golec characterized Reagan as being favorable and sympathetic to Sauget and was of the opinion that Reagan would make a good witness.

Reagan's testimony at trial differed significantly from his statement to Golec. He said that he did not know whether Sauget did in fact touch any

levers when he was beneath the truck. He added that his vision of Sauget was blocked when the bed came down.

In his testimony, Reagan also made reference to the mechanical condition of the truck prior to the mishap. He recalled that the vehicle's hoisting system began to malfunction within a week or two of the truck's purchase from Beuckman by the village. At times the bed would not raise while under a load, and at other times it could not be lifted even when empty. He mentioned that he saw the bed drop twice when it was fully loaded. In all, he stated that the truck was sent to Beuckman for servicing of the hoist on five occasions. Reagan asserted that during one of the service calls, he lodged a complaint with the service manager to the effect that the hoisting problems could be solved if the dashboard cable system controlling the power take-off unit were replaced with a system utilizing a lever mounted on the floor of the cab. When the truck was returned to Beuckman for further repairs after the accident, he said that the cable linkage was removed and a lever on the floor was installed to operate the hoist. The village had no more trouble with the hoist unit on the truck after this lever modification.

Joseph Howard testified that on the morning of September 25 he went to a quarry to pick up a load of lime dust for the construction project. He experienced no difficulty with the hoist until he tried to unload at the job site. He related that after the bed became suspended at 12 to 18 inches, he did not touch any knobs controlling the hoist which would have caused the bed to fall. His opinion as to why the bed fell unassisted is presented in the following colloquy between Sauget's counsel and himself:

"Q. Basing this answer on your years as a driver, Mr. Howard, and with your experience with hoist systems, would you have an opinion as to whether or not this system at the time Arnold was injured was defective?

A. I would have to say yes.

Q. Why?

A. Due to the fact that they took the truck into the shop and they put a new one on there. They put a whole new unit on that there and they changed the knob for the up and down motion from the dashboard to the floorboard. So, I would say there was definitely something wrong with the unit."

Howard's conclusion that the whole hoisting apparatus was replaced was based solely upon his visual inspection of the truck when he picked it up at Beuckman's following the lever installation. After the modification, the hoist ceased malfunctioning.

On cross-examination Howard testified that after Sauget was taken to the hospital he was able to unload the truck with the use of the dashboard

cable system. Furthermore, he stated that he probably went back to the quarry for another load of lime and dumped it at the job site using the same truck that day. Later in the afternoon, Howard raised and lowered the bed for a police photographer who was investigating the accident. A week or two later the truck was sent to Beuckman for the lever modification. Howard, who was the only driver assigned to the vehicle since its purchase by the village, also testified that until Sauget's injury he was aware of no previous incidents where the truck bed inadvertently slammed down against the truck frame rail.

Leslie Darner, the manager of Transportation Equipment Company at the time of the incident and who had two years of college engineering, testified on behalf of Beuckman. We feel it is essential for an adequate understanding of this case to present his testimony concerning the mechanical operation of the hydraulic hoist which his company installed on truck 0435. Simply stated, the hoist is powered by a power take-off unit attached to the truck transmission which rotates a steel shaft connected to a universal joint whose rotation operates a hydraulic pump. Oil is then drawn through the pump from a reservoir and is forced under pressure into a hose which leads to a cylinder. The oil pressure in the cylinder forces a piston to slide which causes the hoist arms of the assembly to expand, thereby raising the truck bed.

The power take-off unit begins with a single gear which meshes with the gears of the transmission of the truck. The power for the unit is supplied by the truck motor itself. To mesh this gear with the transmission gears, the driver must press in the clutch pedal on the floorboard of the cab and pull a power take-off knob located on the dashboard. The knob is attached to a wire cable which, when pulled, activates a small lever on the power take-off which in turn slides the gear into the transmission. As the gear spins, it rotates a steel shaft attached to a universal joint. The universal joint causes two input shafts in the pump to turn, allowing oil to be pumped from the reservoir into the valve assembly of the pump. The pump is attached to the truck frame behind the cab on the passenger side.

There is a piece of grooved steel shafting called a spool which synchronizes with the internal parts of the pump. As the spool turns it opens or closes inlet and outlet ports in the pump through which the oil flows. Thus, manipulation of the spool can: (1) cause oil to be forced through the pump under pressure and into the cylinder thereby raising the bed; (2) prevent oil from entering or exiting the cylinder thereby allowing the bed to remain suspended; or (3) permit oil to flow back through the pump from the cylinder into the reservoir thereby causing the bed to lower. Activation of the spool can be achieved by either a bellcrank lever located on the outside of the pump housing or by a wire cable leading to the dashboard inside the cab which is attached to a knob adjacent to the

power take-off knob. The knob has three positions. When it is pushed all the way in, the spool opens the ports of the pump to allow the free flow of oil to the reservoir from the cylinder and the bed lowers. When it is pulled out to its first position, it blocks the inlet and outlet ports of the pump preventing oil from flowing into or escaping out of the cylinder and the bed remains suspended. Finally, when the knob is pulled all the way out, the oil flows under pressure into the cylinder and the bed raises.

The speed with which the bed raises is a function of both the level of engine rpm, which influences the speed of the pump, and of how far the knob controlling the spool is pulled. The speed of descent is influenced solely by feathering the knob between the hold position and the down position. As we have previously stated, the cable system controlling the spool was replaced with a lever installed on the floorboard after plaintiff's injury.

When asked whether a bent power take-off shaft could cause the bed to have fallen down, Darner responded that a check-valve on the pump would have maintained pressure in the cylinder so that the bed could not lower. As the oil leaves the valve assembly through the output port of the pump to the hydraulic hose which leads to the cylinder, it passes through a one-way check-valve. The check-valve contains a spring-loaded ball which seats against the outlet port of the pump. Since in a hydraulic system resistance to load causes the pump to generate the amount of oil needed to move the load, the pump generates oil at a pressure sufficient to unseat the ball and force oil into the hydraulic hose. If the spool is at a hold or up position and the oil pressure in the pump suddenly drops because, as an example, the power take-off shaft bends, causing the pump to stop, the oil in the cylinder and hydraulic hose which is now at a higher pressure than that in the pump forces the ball in the check-valve to seat against the outlet port, thereby preventing oil from flowing backward through the check-valve. This high pressure oil cannot escape through the return valve of the pump either because this port is blocked by the spool. The high pressure integrity of the cylinder and hydraulic hose is thereby maintained, thus preventing the piston in the cylinder from sliding down under the weight of the truck bed, which would cause the bed to lower. The net effect of a loss in pump pressure would be to suspend the bed at whatever height it achieves at the time of the loss.

On cross-examination Darner was shown a work order dated October 1, 1973, referring to a 1973 Ford F-600 dump truck, plaintiff's exhibit No. 17. The serial number of the truck was not placed on the work order. The work order directed Transportation Equipment Company to check the pump controls and pump pressure and to install a lever control for the spool if necessary. When asked if a new pump was installed on the

truck, he stated that he did not believe so, because no material was charged to Beuckman on the work order. He was of the opinion that the lever mentioned in plaintiff's exhibit No. 17 could have been the same type lever installed on truck 0435. He went on to explain that although the lever was connected to the spool by a rod linkage, this linkage was not to be confused with the bellcrank lever which was part of the pump itself.

■■ George Young, chief engineer of the Ottawa Truck Division which manufactured the Daybrook hoist on truck 0435, reiterated Darner's testimony with respect to the technical aspects of the hoist's operation. He examined truck 0435 over two years after the accident, and the serial number of its hoist was 161306. Plaintiff's exhibit No. 16 is an invoice dated September 10, 1973, sent from Transportation Equipment Com-· pany to Beuckman pertaining to the hoist installation on truck 0435. The serial number of the hoist listed on the invoice is 161306. He, too, felt that a loss in pump pressure or a bent power take-off shaft could not cause the bed to lower if the spool were in a hold or up position. He stated that the only way the bed could have dropped would have been for the spool to be moved to the down position, either by the cable linkage in the cab or manually by the bellcrank lever under the truck, or for the high pressure hydraulic hose running from the pump to the cylinder to fail. However, he added that there could have been no hose failure since the hoist lifted the bed to its full height immediately after the accident. If the hose were broken, the oil in the cylinder would have leaked and the oil pressure sufficient to move the piston in the cylinder could not have been attained.

Restatement (Second) of Torts §402A (1965) provides:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

With respect to the necessary elements a plaintiff must prove to sustain an action based on strict liability in tort against the seller of a product, our supreme court has adopted section 402A in requiring that a plaintiff must demonstrate that his injury resulted from a condition of the product, that

the condition was unreasonably dangerous and that the condition existed at the time the product left the seller's control. *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182.

Sauget contends that the evidence proved that the hoist was defective from the time the village took initial delivery of the truck from Beuckman and that the defect rendered the hoist unreasonably dangerous. He further contends that his injury was proximately caused by this unreasonably dangerous condition. Although Beuckman concedes in its brief that there was a defect in the power take-off unit, it nevertheless argues that the defect neither caused the hoist to become unreasonably dangerous nor proximately caused the truck bed to fall on Sauget. We must agree with Beuckman.

For purposes of this opinion we need only focus upon the element of proximate cause in ascertaining whether Sauget was able to prove up his case. In reviewing the record in this cause, we are mindful that "verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.

The record reveals that Sauget's proof is limited to testimony and exhibits pertaining to a malfunctioning power take-off shaft and to subsequent repair in the nature of lever modification and replacement of the hoist itself. With respect to the power take-off, Sauget established that the defect existed prior to his injury; however, he produced no evidence specifically explaining the defect's role in causing the bed to fall. This failure of proof is apparent in light of the uncontroverted testimony of Beuckman's expert witnesses. According to Leslie Darner and George Young, the bed could be lowered only when there was a reduction in hydraulic pressure in the cylinder, which is caused solely by the loss of oil. Due to the presence of the one-way check-valve on the outlet port of the pump, the only way oil could escape from the cylinder would be through the return valve of the pump. The return valve permits oil to pass from the cylinder through the pump to the reservoir when the spool is in the down position. However, according to the evidence the spool was in the up position in the instant case when the accident occurred, because the bed had been rising and the driver did not touch any controls prior to the bed dropping. The check-valve and the spool would have prevented any oil from escaping from the cylinder when the power take-off unit failed to power the pump after the bed had attained the height of 18 inches. Therefore, the defective power take-off unit would have had no effect on the hydraulic pressure in the cylinder and, hence, could not have caused the bed to fall.

The uncontroverted testimony indicated that the truck bed could have dropped due to the failure of the high pressure hydraulic hose running from the pump to the cylinder; however, there could have been no hose failure since the hoist properly lifted the bed after plaintiff's injury.

For further proof of an unreasonably dangerous condition in the hoist Sauget points toward subsequent repair. The first example of subsequent repair is the lever modification of truck 0435 which entailed replacing the wire linkage controlling the movement of the spool with a floor-mounted lever. However, this repair carries no significance, for there has been no showing that the previous wire cable system contributed in any way to the bed falling. As noted, the bed rose about 18 inches before it stopped, which meant that the spool was in the up position. Given the position of the spool and the driver's testimony that he did not touch any control knobs after the bed began rising and before it fell, the hydraulic pressure in the cylinder could not have dropped. The presence of the hydraulic pressure would have prevented the bed from falling for the reasons stated above. Consequently, even assuming *arguendo* that the spool's wire control linkage were defective, such a defect could not have been the proximate cause of the bed falling because the spool was in the up position at the time of the accident.

Sauget also claims that the subsequent repair took the form of completely replacing the hoist mechanism. His sole support for this point rests upon Joseph Howard's visual inspection of the hoist after the lever modification was completed. However, this claim is refuted by far more reliable evidence contained in the record. George Young examined truck 0435, the truck alleged to have been the one which injured Sauget, over two years after the accident. The serial number of the truck's hoist was 161306. Plaintiff's exhibit No. 16 is an invoice from Transportation Equipment Company to Beuckman dated two weeks prior to the accident which refers to the installation of a hoist on truck 0435. The invoice lists the serial number of the hoist as 161306.

An examination of the record leads us to the conclusion that the evidence presented at trial not only fails to support Sauget's theory of proximate cause based upon a defective hoist, but suggests instead a more plausible explanation of how the truck bed fell. George Young gave two possible reasons for the bed falling, either a tear in a hydraulic hose causing a loss in hydraulic pressure or movement of the spool to the down position. He discounted the first theory for the reason that a tear in a hose would have made it impossible for the bed to be raised later that day without the hose being replaced. His second theory, however, is corroborated by the statement of Melvin Reagan, plaintiff's exhibit No. 49, in which he stated that Sauget went up under the truck and tripped a

lever, causing the bed to fall. This lever could only have been the bellcrank lever which operates the spool and is mounted on the pump underneath the truck.

For the foregoing reasons, we hold that the trial court erred in failing to grant Beuckman's motion for a directed verdict.

Reversed.

JONES, P. J., concurs.[1]

Mrs. JUSTICE SPOMER, dissenting:
I respectfully dissent from the opinion of the majority and would affirm the order of the circuit court. The result reached by the majority in this case appears to rest almost exclusively on the testimony of the defendant's expert witnesses that a defective condition of the hoisting mechanism "could not have caused the bed to fall." I do not think that the jury was bound to accept that testimony at face value, nor that this court should substitute its judgment as to the credibility of the witnesses and the proper resolution of conflicts in the evidence for that of the jury.

In the case of *Bollmeier v. Ford Motor Co.* (1970), 130 Ill. App. 2d 844, 265 N.E.2d 212, this court held that "direct or circumstantial evidence which tends to prove that the product failed to perform in the manner reasonably to be expected in the light of its nature and intended function, such as proof of a malfunction which tends to exclude other extrinsic causes, is sufficient to make a *prima facie* case * * *." (130 Ill. App. 2d 844, 851, 265 N.E.2d 212, 217.) In *Bollmeier* there was evidence of some unspecified malfunction which caused the plaintiff's steering wheel to vibrate. He was injured when the car failed to respond as he attempted to negotiate a curve. Although vibration was always present when the car was driven, no difficulty had been experienced with the steering prior to the time of the accident. This court held that the jury could properly conclude from these facts that the failure of the product to perform as expected caused the plaintiff's injury. After the wreck, there was no visible defect in the steering mechanism, and the wheels responded to the turn of the steering wheel. The court held these facts to be evidence for the jury's consideration but not conclusive on the issue of whether or not the product was defective.

There were facts of record in the present case which I find sufficient to meet the *Bollmeier* test. Several witnesses testified that from the first day it was in use, the hoisting mechanism had never worked properly,

---

[1] Presiding Judge Charles E. Jones and Judge Dorothy W. Spomer replace Judges Peyton Kunce and George J. Moran, who retired after oral argument.

that it had been sent back for repairs several times; in short, that it failed to perform in the manner reasonably to be expected in the light of its nature and intended function. The defendant's witnesses purported to state all the possible ways in which the mechanism could fail, and purported to state definitively that no such failure could have caused the plaintiff's injury. The jury, however, apparently believed that, regardless of what the specific defect was, *some* defect in the hoisting mechanism was the proximate cause of the plaintiff's injury. The proximate cause of an injury is usually a question of fact to be determined by the trier of fact, and can only be raised as a question of law when the facts are undisputed and when there can be no difference in judgment of reasonable men as to inferences to be drawn therefrom. (*Gelsumino v. E. W. Bliss Co.* (1973), 10 Ill. App. 3d 604, 295 N.E.2d 110; *Bouillon v. Harry Gill Co.* (1973), 15 Ill. App. 3d 45, 301 N.E.2d 627.) The operator of the machine testified that he did not lower the bed. The plaintiff testified that he did not hit any lever. It is for the jury, not the appellate court, to resolve conflicts in the evidence and to judge the credibility of the witnesses. In my opinion, the verdict of the jury was supported by the evidence, and the defendant's motions for directed verdict and judgment notwithstanding the verdict were properly denied.

I would affirm the order of the circuit court.