NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-592                                            Appeals Court


COMMONWEALTH  vs.  DOUGLAS F. GUINAN.


No. 13-P-592.


Berkshire.      April 8, 2014. - October 3, 2014.


Present:  Berry, Katzmann, & Sullivan, JJ.




Motor Vehicle, Homicide, Operating under the influence, Defect.
    Homicide.  Evidence, Expert opinion, Qualification of
    expert witness, Intoxication, Third-party culprit.
    Witness, Expert.  Intoxication.



    Indictments found and returned in the Superior Court
Department on February 18, 2011.

    The cases were tried before Daniel A. Ford, J.


    Susan E. Taylor for the defendant.
    John P. Bossé, Assistant District Attorney, for the
Commonwealth.


    SULLIVAN, J.  Douglas F. Guinan appeals from convictions of

motor vehicle homicide while under the influence of alcohol; and

operating a motor vehicle while under the influence of alcohol,

causing serious bodily injury.  See G. L. c. 90, § 24G(a); G. L.

c. 90, § 24L(1). He contends that the trial judge abused his discretion in admitting, over objection, expert testimony ruling out the computer-assisted power steering mechanism of the defendant's automobile as a cause of the collision. We conclude that the State trooper who offered this opinion lacked the qualifications to testify regarding the computer system employed in the operation of the motorized power steering mechanism. Because the issue of causation was a central issue at trial, the error was prejudicial. Accordingly, we reverse.

Background. 1. The collision. On October 23, 2010, while traveling north on South Street in Pittsfield, a 2011 Hyundai Sonata operated by the defendant crossed the center line and struck an oncoming Ford Focus, killing the passenger, Michael Ashline, and seriously injuring the driver, Nicole Rudd. The crash occurred at approximately 5:00 P.M. The weather and road conditions were dry, and the percipient and expert witnesses agreed that the defendant's car was going at the speed of traffic and within the speed limit.

Five witnesses who were traveling on South Street at the time of the collision testified that they observed nothing unusual before the defendant's car suddenly swerved left and crossed the center line. Two other witnesses testified that the car veered to the right once, then a second time, striking the curb and causing rubber to peel off the passenger's side tire.

The car then veered to the left and into oncoming traffic. The Commonwealth's accident reconstruction experts did not, however, observe any damage to or marks on the tires or the whitewalls consistent with hitting a curb (or anything else) before the crash.

There were five cans of beer in the car -- one open twelve-ounce "Bud Light" beer can with liquid on the lip found on the floor of the front passenger's side, and four unopened twelve-ounce "Bud Light" beer cans on the back seat and floor. The paramedic and the police officer at the scene detected an odor of alcohol coming from the defendant. The defendant's whole blood alcohol concentration was .06 percent; the judge instructed the jury that impairment could not be inferred from that blood alcohol concentration alone, and that they must look at all of the evidence in the case.

The defendant was prescribed Vicodin for pain on September 21, 2010, and was scheduled for gall bladder surgery in November of 2010. At the time of the collision, one month after receiving the prescription, he had taken six of the fifteen pills prescribed. Blood tests showed the presence of 1.4 micrograms of hydrocodone, the analgesic pain reliever found in Vicodin, per deciliter of blood. Both alcohol and hydrocodone are central nervous system depressants. According to the emergency department trauma unit surgeon who treated the

defendant, hydrocodone and alcohol in combination increase the effect of one another.

The surgeon treated the defendant for alcohol withdrawal because the defendant, unconscious on admission, appeared disoriented and agitated when he regained consciousness. Six days later, the defendant had a magnetic resonance imaging (MRI) examination. He then was seen by a neurologist who determined that the defendant suffered from diffuse axonal injury, a traumatic brain injury otherwise known as "brain sheer." The neurologist and the surgeon testified that the symptoms of brain sheer are the same as those of alcohol withdrawal, i.e., agitation and disorientation, and that brain sheer also causes short-term memory loss. Both physicians agreed that the brain sheer could not have been diagnosed upon admission, and that it was not evident until the MRI was conducted several days later, after the defendant's condition had stabilized. There was no testimony concerning long-term alcohol abuse or dependency.

The defendant testified at trial, stating he had no memory of the collision or of most of the events leading up to it. He did recall working with his wife Cheryl to close up their lake house on the day of the crash. The defendant could not recall whether he had taken Vicodin or had drunk beer that day. Cheryl testified that she left the lake house at 3:30 P.M., and had not observed the defendant drink alcohol or take Vicodin while they

were together.  She saw him drive past her at approximately 4:00 P.M.  She confirmed that, since the collision, the defendant has suffered from short-term memory loss, and has had issues with his speech and his judgment.

2.  The recall notice.  After the collision, Cheryl received a notice of recall from Hyundai Motor America (Hyundai), which stated that 2011 Hyundai Sonata vehicles "may have improperly assembled or loose steering column intermediate shaft universal joint connections," a defect that, if uncorrected, "would" cause the driver to "lose the ability to steer the front wheels," and "may increase the risk of a vehicle crash."  The recall notice also stated that a Hyundai dealer "will update the power steering software to ensure that steering wheel vibration or shaking will not occur as a result of a motor driven power steering malfunction."  The recall notice further stated that "manual steering is still operative," and a warning light "will illuminate indicating that the power steering is not operating properly."  Cheryl brought the recall notice to the Pittsfield police.

3.  Expert testimony.  The role of the power steering in the collision was contested at trial.  State Trooper Michael George testified as an expert for the Commonwealth.  Trooper George attended vocational high school, and worked as an automobile mechanic and a tow truck driver before becoming a

dispatcher for the North Attleborough police department.  After joining the State police, Trooper George received extensive training and experience as an accident reconstruction specialist.

There was no objection to the trooper's testimony as a mechanical expert or as an accident reconstruction expert.  The trooper conducted the mechanical inspection outlined in the recall notice and the accompanying technical service bulletin.[1]  He opined that there was no mechanical failure in the steering mechanism, and that the steering system was "properly installed."

There was objection, however, to the trooper's testimony regarding the computer system and the software update.  The Hyundai Sonata was powered by a computer-assisted, motor-driven power steering mechanism, not a mechanically operated hydraulic power steering mechanism.  Because the recall notice was received after the collision, the software update had not been performed.  The defendant objected to the testimony of Trooper George regarding the computer system on the ground that George had no "foundation for his knowledge" of the system or the software.  The judge overruled the objection, but directed the

---

[1] The inspection was observed by defense counsel and various experts for Hyundai and the parties to pending personal injury actions.

prosecutor to lay additional foundation in the presence of the jury.

While the trooper had a background in automobile mechanics, he did not testify to any training or experience in computer science, computer software, or computer systems.[2] He had "inspected," but not "worked on" the type of computer-assisted motorized steering system described in the recall notice. He did not examine the software or the computer program, and did not observe the process for updating the software on any other vehicle. He did not display any specific knowledge of how the software program in the recall notice actually worked. The trooper testified that he had conversations with Hyundai mechanics and had read articles, manuals, and online resources, including interviews with engineers in peer-reviewed journals, concerning the motorized power steering system.[3]

---

[2] George was an "Automobile Master Technician," certified by the National Institute for Automotive Excellence, an organization he described as "a nationally recognized certifying body where you have to pass a test on engine performance, transmissions, brakes, [and] electrical systems."

[3] Prosecutor: "Have you ever worked on cars or worked on motor driven power steering in your life?"

George: "I've never directly worked on them but I have inspected them. And in this case, to help lay the foundation, I went to two separate Hyundai dealers before this trial and spoke with the service managers and shop foreman of both dealerships. I got information from them on how the system works, directly from them. I did research online as far as how the electric power steering system works. There are interviews with

Over renewed objection, the trooper then testified at length regarding the computer software and the relationship between the motorized power steering and the computer system. He stated that the motorized power steering provided additional assistance to the steering mechanism, but could not "take over" the car.[4]  He further testified that, based on his discussions with the mechanics and his research, "the system is built with numerous fail-safes.  As long as your hand is on the wheel you can control the car."  He stated that the mechanical system always remained available to steer the car, and that sensors in the computer system would "shut down a system if there are any malfunctions."  The trooper ruled out the motor-driven power steering as a cause of the crash.

On cross-examination, however, the trooper acknowledged that this description was based on what happened when the computer system was operating properly.  He stated that the computer program linked to the motor changes the amount of assistance given to, and torque on, the steering column based on

---

engineers that developed these systems that talk about the fail-safe issues with them and how they prevent anything from going wrong, what happens if something does go wrong.  There [is] a lot of published information out there from known peer-reviewed sources that I reviewed leading up to this trial."

[4] Prosecutor:  "Let me ask you this:  Does the motor-driven power steering system have the ability to take over control and steer the car?"

George:  "No."

the speed of the car.  He agreed that the motor may react very quickly and may move with a lot of force when it is directed to do so by the computer program, which controls both amperage and voltage.  He also testified that similar motor-driven systems in other cars can be programmed to provide "park assist," that is, parking of the car without any assistance by the driver or manual operation of the steering column.  He reiterated, however, that this car did not have park assist, and that the safety features in this vehicle's computer program would turn the system off if there were an unusual event.

It also emerged during Trooper George's testimony that although he inspected the mechanical components of the car in the first inspection, there was a second inspection where various people representing the parties in the pending civil and criminal litigation were present, and representatives of Hyundai ran a series of computerized diagnostic tests of components of the car.  On cross-examination Trooper George acknowledged that he had not seen these software programs before and was unaware of the results.  He did not make an effort to determine if there was an event data recorder in the vehicle, and did not inquire of Hyundai.[5]  On redirect, he continued to opine that the motor-

---

[5] The Pittsfield police were unable to obtain data from the car's event data recorder because Hyundai would not permit access to the proprietary software necessary to read the event data recorder.  The record does not disclose exactly who

driven power steering played no role in the collision.[6]

Discussion. 1. Expert testimony. A judge "has broad discretion regarding the admission of expert testimony"; we review that decision only for an "abuse of discretion." Commonwealth v. Robinson, 449 Mass. 1, 5 (2007). "'The crucial issue,' in determining whether a witness is qualified to give an expert opinion, 'is whether the witness has sufficient "education, training, experience and familiarity" with the subject matter of the testimony.'" Commonwealth v. Richardson, 423 Mass. 180, 183 (1996), quoting from McLaughlin v. Selectmen of Amherst, 422 Mass. 359, 361-362 (1996). See Mass. G. Evid. § 702 (2014). Testimony "'on matters within the witness's field of expertise is admissible' when the testimony concerns matters beyond the common knowledge of the jurors and will aid the jurors in reaching a decision (emphasis supplied). . . . Consequently, a judge's discretion can be abused when an expert

---

initiated or was present at the second inspection, whether Hyundai proprietary software was used in the second inspection, or whether an event data recorder was examined. Defense counsel represented to the judge during the hearing on motions in limine that Hyundai declined to provide the defendant with the codes necessary to permit his expert to examine the software.

[6] Prosecutor: "Was there anything that you could observe about the car, the motor-driven power steering system, that the failure of that or malfunction in that could have contributed to the crash that occurred as you described it?"

George: "No."

witness is permitted to testify to matters beyond an area of expertise or competence." Commonwealth v. Frangipane, 433 Mass. 527, 533 (2001).

Trooper George had no training or experience in electronic power steering, or in the computer software and sensors that control it. He had no background in computer science or software engineering. While George was qualified to opine as to the mechanical integrity of the car, and to evaluate the forces interacting in a collision as an accident reconstruction expert, he was not qualified to opine regarding the electronic software update and the operation of the computer-assisted, motor-driven power steering system. The witness exceeded the scope of his expertise. See ibid. (expert permitted to testify to dissociative memory loss in child sex abuse victims, but should not have been permitted to testify to neurological processes underlying traumatic memory loss). See also Guinan v. Boston Elev. Ry., 267 Mass. 526, 528 (1929) (expert who did not have knowledge of chemical properties, composition, and inflammability of motion picture film was not qualified to testify to cause of flash fire).

We are "particularly concerned" that George's "ultimate conclusion" as to the cause of the collision "was based on information that we rely on experts to interpret and which [George] did not have the qualifications to evaluate." Peterson

v. <u>Foley</u>, 77 Mass. App. Ct. 348, 352 (2010) (police officer not qualified to give expert opinion on speed as cause of motor vehicle crash where he lacked expertise in accident reconstruction). George's lack of familiarity with the software programs at issue was brought into stark relief by his testimony, in which he described the recall notice's proposed repair to the power steering software simply as "basically hitting update."[7]

In the absence of relevant training or experience, the witness was not able to bring independent judgment to bear on the information provided by the sources he consulted. It was for the expert to evaluate whether "the concerns that prompted the recall were [accurately] . . . set forth in the recall" notice, the technical service bulletins, and the online resources. <u>Santos</u> v. <u>Chrysler Corp</u>., 430 Mass. 198, 208 (1999). In view of the fact that the trooper also failed to ascertain the results of the other diagnostic tests performed in the second inspection, and had no knowledge of or familiarity with the software programs at issue, his opinion was at best, adopted

_____

[7] George previously had testified on direct examination, "There was nothing that could be done. It was just a matter of the technician plugging in the computer and sending a different software program to the module that controls the motor-driven power steering."

hearsay, and at worst, "merely an opinion, ipse dixit."

Peterson v. Foley, supra at 354.[8]

The Commonwealth urges us to treat this as a case involving a subspecialty of discrete knowledge to which the trooper, as a generalist, was permitted to testify. See Commonwealth v. Mahoney, 406 Mass. 843, 852-853 (1990). "A witness's training and experience may well qualify him to give an opinion in reference to a problem which he has never before encountered in precisely the same form." Commonwealth v. Bellino, 320 Mass. 635, 638 (1947). See Commonwealth v. Mahoney, supra; Commonwealth v. Gomes, 459 Mass. 194, 205-206 (2011). For example, in Bollmeier v. Ford Motor Co., 130 Ill. App. 2d 844, 848-849 (1970), a master mechanic with extensive experience in the hydraulic steering mechanisms found in heavy equipment, trucks, tractors, and cars was permitted to testify to the failure of the hydraulic steering mechanism in a Ford Thunderbird, even though he never had worked on a Ford. The experts in that case agreed that hydraulic steering mechanisms

---

[8] This case stands in stark comparison to those in which an expert with knowledge of and experience in the subject matter of his testimony consults with others in formulating an opinion. For example, in Commonwealth v. Pope, 19 Mass. App. Ct. 627, 628 (1985), a witness with significant training and experience in the gaming industry consulted with a retired law enforcement official concerning the analysis of gaming slips. The expert noted areas of agreement and disagreement based on his own considerable training and experience, and was found to have ultimately exercised independent judgment. Id. at 629.

were substantially the same in all types of vehicles.  Id. at 849.

This case, by contrast, involves far more than a variation in form.  There is no evidence in the record that any portion of George's general training as a mechanic equipped him to evaluate the ability of a computer software program to direct a motor to move the steering mechanism, or to determine whether defects might exist in the computer system or in the software program. See Commonwealth v. Frangipane, 433 Mass. at 533.[9]  George lacked the knowledge and the expertise (whether as a generalist or as a specialist) to understand and to evaluate the efficacy of the computer system or its software.  See, e.g., Articulate Sys., Inc. v. Apple Computer, Inc., 66 F. Supp. 2d 105, 108-109 (D. Mass. 1999) (witness without computer science degree or programming experience lacked necessary qualifications to

---

[9] See, e.g., Watson v. Ford Motor Co., 389 S.C. 434, 450-451 (2010) (error to admit expert testimony of software developer regarding cause of crash where expert had no experience with cruise control systems).  See also Olson v. Ford Motor Co., 411 F. Supp. 2d 1137, 1143-1144 (D. N.D. 2006) (accident reconstruction expert unqualified to offer opinion as to design defects in vehicle); Azzano v. O'Malley-Clements, 126 Ohio App. 3d 368, 376 (1998) (accident reconstruction expert not qualified to offer opinion as to likelihood of bodily symptoms resulting from collision).  Cf. Cansler v. Mills, 765 N.E.2d 698, 703-704 (Ind. App. 2002), overruled on other grounds by Schultz v. Ford Motor Co., 857 N.E.2d 977 (Ind. App. 2006) (expert testimony of mechanic as to deployment of air bags properly excluded where mechanic had no training or experience in air bag systems); Kitchens v. McKay, 38 Ohio App. 3d 165, 169 (1987) (witness who lacked education or experience in design defects of forward-control vehicles barred from testifying as expert).

testify in patent action); Sennett v. State, 406 S.W.3d 661, 668 (Tex. App. 2013) (witness's credentials insufficient to support qualification as forensic computer expert).[10]

The claim of error was preserved. The issues at trial were impairment and causation. The improperly admitted evidence was extensive and detailed. If believed, it foreclosed any argument that the collision was caused by the computer-assisted, motor-driven power steering. Because Trooper George was qualified in the presence of the jury, inadmissible hearsay regarding his conversations with Hyundai mechanics, and the opinions of Hyundai engineers, "about the fail-safe issues with the [power steering system] and how they prevent anything from going wrong," was heard by the jury during the direct examination of the witness. See Commonwealth v. Greineder, 464 Mass. 580, 601-602, cert. denied, 134 S. Ct. 166 (2013) (precluding testimony on direct examination about hearsay underlying expert opinion).[11]

---

[10] Put another way, the Commonwealth's suggestion that George's research and consultations rendered him an expert in the area of motor vehicle software programs "ignore[s] the conceptual distinction between an expert's qualifications and the reliability of his proffered opinion." Folsom v. Kawasaki Motors Corp. U.S.A., 509 F. Supp. 2d 1364, 1377 (M.D. Ga. 2007), quoting from Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1342 (11th Cir. 2003). The former turns on familiarity with the field, the latter focuses on the bases of the opinion. Ibid.

[11] In addition, "Such an offer and finding by the [c]ourt might influence the jury in [their] evaluation of the expert and the better procedure is to avoid an acknowledgement of the

Finally, the prosecutor forcefully and repeatedly argued in closing argument that the trooper's testimony regarding causation put to rest any suggestion that the issues identified in the recall notice played a role in the crash.[12]  Because the testimony went to the heart of the defense that the collision may have been caused by a malfunction of the computer-assisted power steering system, it cannot be said that the error in admitting the testimony "did not influence the jury, or had but very slight effect."  Commonwealth v. Frangipane, 433 Mass. at 537, quoting from Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994).

The Commonwealth submits that the evidence of impairment was overwhelming, and that no prejudice may be found.  We disagree.  The evidence as to impairment was inferential and conflicting.  The blood alcohol concentration was .06 percent. The judge told the jury that they could not, from those results, "draw any inference either way as to whether or not the defendant was under the influence of alcohol," and that they

---

witness['s] expertise by the [c]ourt."  Commonwealth v. Frangipane, 433 Mass. at 530 n.4.  For this reason, the Supreme Judicial Court has strongly urged that expert qualification be undertaken outside the hearing of the jury.  Ibid.  In this case, no motion in limine was filed and the challenge to the expert's qualifications arose during trial.

[12] "They cannot take over the steering of your car. . . . They cannot force your vehicle into oncoming traffic.  That was his expert opinion. . . .  [H]e told you that there is no way it could happen.  It's impossible."

must "look to all the evidence in the case." The jury were asked to conclude that the defendant had consumed two beers between 3:30 P.M. and 5:00 P.M., and had taken one or more of the Vicodin pills that day. The jury could have so found, but the circumstantial evidence was far from overwhelming, given the medical testimony that his postaccident behavior also could be attributed to brain sheer. The prejudice associated with the admission of improper expert testimony was significant.

The Commonwealth also maintains that the defendant should not have been permitted to argue that the collision was attributable to the power steering mechanism because the defendant was unable to testify to what occurred at the time of the crash. Just as the Commonwealth sought to convince the jury that the precipitous turn into oncoming traffic was the product of impairment, the defendant was entitled to argue from the evidence that the assessment of the steering mechanism was incomplete, and that the software defect identified in the recall notice caused the crash. The fact that "certain tests were not conducted or certain police procedures not followed . . . could raise a reasonable doubt as to the defendant's guilt in the minds of the jurors." Commonwealth v. Lao, 460 Mass. 12, 23 (2011), quoting from Commonwealth v. Bowden, 379 Mass. 472,

486 (1980).[13]  See Commonwealth v. Silva-Santiago, 453 Mass. 782, 801-804 (2009).

2.  Similar circumstances.  In view of our disposition, we address only those issues likely to recur in the event of a retrial.[14]  The defendant maintains that it was error to exclude the testimony of Tara Winter, who testified in a voir dire hearing that, while driving her 2011 Hyundai Sonata, the car took a sudden turn to the left that she initially was unable to control.  The defendant contends that the testimony was relevant to show that a third-party culprit, to wit, his car, was responsible for the collision.  See Commonwealth v. Hoose, 467 Mass. 395, 410 (2014).

"Trial judges are permitted broad discretion in determining whether to exclude evidence that a third party committed the crime."  Ibid.  The parties have not submitted, and we have not found, a case in which the alleged third-party culprit was a car.  Rather, the cases focus on the issue of causation.  See, e.g., Williams v. State, 165 Ga. App. 831, 832 (1983)

---

[13] The Commonwealth recognized its obligation at trial, telling the jury in its opening statement, "Now, during the investigation of a case like this, the police have a responsibility to examine all of the evidence and pursue all of the leads."

[14] We do not address the defendant's argument that the admission of the hearsay basis of Trooper George's opinion violated Crawford v. Washington, 541 U.S. 36, 57 (2004), and created a substantial risk of miscarriage of justice.

(mechanical defect in car presented questions of accident and causation in motor vehicle homicide case).  Nor have we confronted the question whether evidence of similar circumstances, e.g., other accidents, is admissible in a criminal case.[15]  We need not decide whether these doctrines apply, however, because even if they did, we conclude, as did the trial judge, that the evidence was too speculative to warrant admission.

Because the right to raise a third-party culprit defense is one "of constitutional dimension, we review the judge's ruling independently."  Commonwealth v. Hoose, supra.  Both lines of cases are concerned with the danger of speculative evidence.  With respect to third-party culprit evidence, nonhearsay is admissible if it has "a rational tendency to prove the issue the

_____

[15] The defendant sought admission of evidence of similar circumstances for substantive purposes based on a third-party culprit defense, as opposed to a Bowden defense.  See Commonwealth v. Silva-Santiago, supra (discussing distinctions between third-party culprit defense and Bowden defense).  In a civil case, where the burden of proof is on the plaintiff, the plaintiff first must produce evidence of a defect before evidence of other accidents may be admitted for corroboration or to refute evidence that the car is safe.  See Carey v. General Motors Corp., 377 Mass. 736, 744 (1979); Santos v. Chrysler Corp., 430 Mass. at 204-205.  The Santos formulation does not apply seamlessly in criminal cases, where the Commonwealth bears the burden of proof and the defendant has a right to argue that the burden has not been met.  Given our conclusion, however, we need not decide whether expert testimony regarding the existence of a defect is a predicate to the admission of evidence of other accidents in the context of a third-party culprit defense.  Compare Santos v. Chrysler Corp., supra.  See generally Kaitz v. Foreign Motors, Inc., 25 Mass. App. Ct. 198, 201 (1987).

defense raises, and it is not 'too remote or speculative.'" Ibid., quoting from Commonwealth v. Bizanowicz, 459 Mass. 400, 418 (2011). In a civil proceeding, evidence of other accidents is admissible "if the judge first determines that the jury could find a substantial similarity in circumstances." Santos v. Chrysler Corp., 430 Mass. at 202. This type of evidence is open to objection, however, because of the danger of unfairness, confusion, and speculation. Ibid.

Here, Winter testified on voir dire that a salesperson at a Hyundai dealership told her that a bolt had broken on the car's steering column, and that the dealership took the car back. In this case, the Commonwealth had introduced expert testimony to show that there was no mechanical defect in the defendant's car. Although the defendant's offer of proof was that Winter's car had the mechanical defect described in the recall notice, this defect was not found in the defendant's car.[16] There was, therefore, a marked difference in the condition of the steering systems in the two cars, and any link between the two cars was purely speculative. The defendant failed to demonstrate a substantial similarity between his and Winter's vehicles. The exclusion of evidence concerning Winter's car was not in error.

---

[16] The fact of the recall did not prove the existence of a defect in either car, but the recall notice placed the Commonwealth on notice of a possible defect. See Santos v. Chrysler Corp., supra at 207.

Furthermore, the judge did not preclude the third-party culprit defense.  The recall notice was admitted in evidence and the defendant argued to the jury that the car was the cause of the collision.  The judge did not abuse his discretion in excluding Winter's testimony on the basis of the record before him.  See Commonwealth v. Hoose, supra.

Judgments reversed.

Verdicts set aside.