RONALD E. FRISCH, Plaintiff-Appellee, v. INTERNATIONAL HARVESTER COMPANY, Defendant-Appellant, Cross-Appellee.—(JOHN WOODS, Individually and d/b/a Earlville Implement Company, Defendant-Appellee, Cross-Appellant.)

(Nos. 54077, 54257 cons.; )

First District (2nd Division)—October 28, 1975.

508

Jacobs, Williams and Montgomery, of Chicago (Wyatt Jacobs, C. Barry Montgomery, and Theodore T. Scudder III, of counsel), for appellant.

Philip H. Corboy, Albert E. Hofeld, and William J. Harte, all of Chicago, for appellee Ronald E. Frisch.

William Parker Ward, of Chicago, for appellee John Woods.

Mr. PRESIDING JUSTICE DOWNING delivered the opinion of the court:

Defendants International Harvester (Harvester) and John Woods (Woods) appeal from a bench trial finding in strict liability and judgment for $125,000 for plaintiff Ronald Frisch (Frisch) for personal injuries sustained by Frisch in a fire while using a tractor manufactured and distributed by Harvester to Woods who sold it to Frisch. Harvester also

appeals a judgment for Woods for $125,000 on his indemnity counterclaim against Harvester.

The following issues are presented for review:

(1) whether Frisch has proven defendants are liable in strict liability;

(2) whether Frisch is precluded from recovery by the doctrine of risk;

(3) whether errors occurred during the trial so as to preclude the defendants from receiving a fair trial;

(4) whether the finding in favor of Woods on his indemnity counterclaim against Harvester was error; and

(5) whether the judgment of $125,000 was excessive.

Frisch, in his complaint based on strict liability in tort, claimed that on May 4, 1959, while in the exercise of ordinary care for his own safety and using a McCormick Farmall 350 tractor, designed, manufactured and sold by Harvester to Woods, a spray of gasoline from the tractor ignited and burned him. Joined as codefendants were Harvester and Woods, the latter who sold the tractor to Frisch as well as supplied accessories and serviced the tractor. Woods counterclaimed against Harvester for indemnification, based on breach of an implied warranty and strict liability in tort. Harvester counterclaimed against Woods on an active-passive theory[1] and also filed a third-party complaint against the company which manufactured and supplied the tractor fuel cap, but then moved to voluntarily dismiss the latter from the litigation.

The following is a summary of the pertinent evidence. To understand the condition of the tractor at the time of the incident, a description of the cap on the tractor at the time of the incident is essential. As originally delivered by Harvester to Woods, the tractor contained a flat cap. A Woods employee exchanged the cap for a fuel gauge previously obtained by Woods from a Harvester parts depot. It was the fuel gauge cap that was in use at the time of the incident.

In the center of the top of the cap is a fuel gauge. Two metal rods extend down through the cap and, when inserted through the filler neck of the tank, continue on into the tank. On the bottom of the cap is attached a piece of metal which narrows horizontally into two "tangs."[2] These "tangs," when the cap is inserted into the filler neck, drop into two openings in the rim of the neck. When the cap is turned clockwise, the tangs engage the rim until they encounter two vertical downward

---

[1] The trial court found against Harvester on its counterclaim against Woods based on the active-passive theory of negligence. Harvester does not appeal that holding.

[2] While, by reference to dictionaries, it appears "flanges" would be a more accurate description of this piece of metal narrowing to flat ends, they were referred to as "tangs" throughout the trial and will be so referred to here.

extensions. Just prior to these encounters, the rim rises slightly on both sides such that, when engaging, the tangs also rise. These rises in the rim were referred to at trial as "notches" or "detents" and constitute the locking mechanism on the tank.

Between the two metal rods extending downward from the cap is a cork floater which, by means of a spiralling rod in the center of the floater, registers on the gauge the amount of gas remaining in the tank. In the cap itself are four baffles, of which only the baffle closest to the top of the cap is at issue here. Around the gauge at the top of the cap is a small air vent hole and a legend reading "BUY CLEAN FUEL—KEEP IT CLEAN." [3]

The tractor in issue (Frisch tractor) was a McCormick Farmall 350 assembled by Harvester on April 25, 1957. Prior to shipment to Woods the following day Harvester alleges an inspector tightened a cap on the filler neck of the gas tank to determine if the locking mechanism had the "proper tension." Gasoline was also put in the tank and the entire tractor inspected. Upon arrival at Woods' shop, an employee also inspected the entire tractor. When the fuel gauge filler cap at issue (Frisch cap) arrived at Woods' parts department an employee examined it. It was subsequently installed on the Frisch tractor.

Frisch purchased the tractor from Woods on September 18, 1958. He was given an owner's manual which, Woods asserted, was the only information Frisch received concerning the operation and maintenance of the tractor. The manual contains no warnings that pressure or vibration could cause the cap to loosen or of the importance of securing the cap in a locked position while the tractor is in operation. Additionally, no legends appear on the cap or the tank warning potential users that pressure or vibration could cause the cap to loosen or of the importance of securing the cap in the locked position while the tractor is in operation.

For seven months, Frisch put the tractor to a variety of uses on the 160-acre farm he was leasing in Ottawa, Illinois. During this period, the tractor was serviced by Woods' shop at least five times. The repair closest related to the gas tank was performed by Frisch himself when, after receiving advice and instruction from one of Woods' employees, he repaired a leak in the sediment bowl located below the gas tank. An inspection after the accident showed this repair to have been completely effective and not at all involved in the accident.

Frisch observed on two or three occasions, during later March or April

---

[3] It should be noted that the above description derives from examination of the Frisch cap (which was damaged by the fire) as well as other fuel gauge filler caps presented at trial and for our perusal on review.

of 1959, that the fuel gauge filler cap had become "partially disengaged" to the extent of "approximately one inch" from the locked position. He noticed this disengagement due to the gauge not being in its normal position, and that when so disengaged the cap would "wobble a little bit." He allegedly corrected this problem each time by screwing the cap back to the locked position, after which, he testified, it remained locked.

On May 4, 1959, Frisch filled his tractor tank with gasoline from an overhead tank he maintained on the premises. From 6 to 9 a.m., he plowed ground corn with a three-bottom plow (the plow intended for a Farmall 350) without difficulty. After a half-hour break, he refueled observing at that time neither any unusual noises nor any fuel coming out of the tank. He testified he relaced the cap securely in the locked position. After plowing for 30 minutes, he met a neighbor, Charles Conger, at a mutual fence line. Both men turned off and disembarked their tractors, talking at the fence line for 15 to 20 minutes. At trial, Frisch testified he did not turn the gas cap but may have had his hand on it while talking to Conger. When he got back on the tractor he noticed nothing unusual about the position of the cap.

As Frisch resumed plowing, the weather was clear and the temperature was, according to various estimates, in the 90's, with a wind from the east. After Frisch proceeded down and up two "dips" in the land, during which the engine began sputtering and almost stopped, he observed he was plowing clay. While turned around to raise the plow out of the ground, he heard a small "click." Turning again to the front, he saw the gas cap was "fully extended" and "leaning slightly towards the left," apparently with the metal rods resting on the filler neck. A column of gas shot up 6 to 8 feet and spread out covering the top half of his body with raw gasoline. He testified he then shut off the motor and jumped from the tractor. Finding himself to be on fire, he rolled on the ground to put out the flames and ran home where his wife took him to the hospital.

Seeing black smoke, Conger and two neighbors drove to Frisch's farm in Conger's pick-up truck. Conger testified a flame of from three to four inches was arising from the filler neck. Finding no one at Frisch's house, Conger proceeded to the home of Earl Anderson, Frisch's father-in-law. Anderson testified he went out to the tractor and observed the gauge cap leaning on the rods on the neck out of which was burning a flame of about five to six inches. He removed the cap with his handkerchief, the flame came out with the cork floater, and he rolled the floater on the ground to extinguish the flame. He then wiped the back of the cap off and put it back in the tank.

Frisch called two employees of Harvester as section 60 witnesses.

(Ill. Rev. Stat. 1967, ch. 110, par. 60.) Actually, one of the witnesses, Rudolph A. Holmberg, in charge of liason activities between Harvester and Rochester Manufacturing Company (manufacturer of the caps in issue) from 1955 to 1957, had ceased employment with Harvester just prior to his testifying. Holmberg testified that a test group at Harvester had designed both the baffles and the shell and had tested the cap after it had been developed by Rochester. He also testified to changes he had ordered in the alignment procedure and size of the vent holes, but that such changes did not extend to caps in the "territory." Thus the Frisch cap, already in the parts department at Woods' shop, was not so changed. An indication that Holmberg considered the previous procedure defective is found in the fact that he authorized the parts depots and tractor works to bill Rochester for the expenses of reworking the caps. In the course of examining Holmberg, plaintiff introduced into evidence letters of complaint and of various developments concerning pressure and vibration problems with Harvester gas tanks, which introductions defendant cites as error.

Richard Coleman, head of the test group referred to by Holmberg, was also called as a section 60 witness. He alleged he was "probably sure" a cap could not come loose with vibration, since none had done so in the various "torture" tests to which the tractors examined had been put and since tests conducted on a vibration table were unable to dislodge the cap from a locked position. No specific tests, however, were conducted on tractors as to this potentiality. Coleman also alleged various vent hole sizes had been tested and that the 1/16" size was found to be the "optimum for tractor operation." While he also alleged clearance between the shell and baffle made no difference in venting, he conceded the test group had recommended a clearance of ⅛ inch.

The characteristics of the Frisch cap were testified to by expert witnesses called by Frisch. It was undisputed that the vent hole size was .063" (about 1/16"), that "something solid" in the first baffle prevented a pin stuck through the hole in the shell from proceeding further, and that the clearance between the shell and baffle varied but was, at maximum distance, about .013 inches. The width of the tangs was variously measured as being between .368" and .375" and the notches or detents as between .33" and .408 inches. An expert witness for Frisch measured the height of the notches or detents as between .008" and .010" or the equivalent of three to four strands of hair. It was undisputed that there was no positive stopping device in the notches and that the tangs were, in fact, wider than the notches even with the variance in measurement testified to as noted above. Recommendations of the American Society of Engineers promulgated after the incident were introduced which sug-

gested that the notches should be more than ½″ and the tangs between ¼″ and ⅜″ with the notches larger than the tangs so no question exists that the tangs are engaged. Harvester's witnesses contended at trial, however, that the fact the tangs were wider than the notches made no difference since, due to the curve of the tang, there was contact between the tang and notch only at a point within the notch. This point of contact would be the same if the tangs were narrower than the notches and thus the same amount of pressure or vibration would be needed to loosen the cap. Indeed, an expert witness for Harvester alleged that the notches were not necessary to lock the cap.

A great deal of disputed expert testimony was presented as to the extent of temperature—and therefore pressure—build-up in the Frisch tank prior to the incident. Frisch's experts' test in this regard was conducted on a Harvester Utility 300 in which, it was admitted, the engine was about one inch away from the tank as opposed to a Farmall 350, in which the engine is six inches away from the tank. Frisch's experts alleged this difference did not affect the validity of the test as a basis for judging the temperature rate in the Frisch tank. Harvester introduced a great deal of evidence, however, showing the test to be inapplicable. None of Frisch's experts' other tests go to the feasibility of pressure build-up or vibration either together or separately causing the cap to come loose from a locked position. Harvester introduced considerable testimony denying the feasibility of temperature (and, therefore, pressure) building up to a degree necessary to cause the cap to come loose. It introduced no testimony denying the feasibility of vibration doing the same.

Frisch's experts additionally confirmed the potentiality that sparks or flames from the exhaust manifold, located 24 inches in front of the gas tank, had caused the gas on Frisch to ignite. The existence of such sparks on other tractors was affirmed by both farmers and Harvester employees who testified.

Evidence admitted solely against Woods indicated Woods was receiving complaints of thumping noises in gas tanks on various tractor models. The evidence indicated these noises were caused by vapor pressure build-up in all tractor gas tanks, often causing gasoline vapor to escape through the gas cap vents. Frisch had been aware of vapor pressure but did not complain about it to Woods. Woods relieved the pressure on some tractors by enlarging the gas cap vent hole. Woods testified that about six months before the Frisch incident, he received from Harvester a bulletin about enlarging gas cap vents.

Frisch's injuries consisted of first, second and third degree burns on his chest, neck, arms, face and forehead. No infections or complications resulted and no skin grafting was required. Certain remedial plastic

surgery was performed. Although Frisch had a burn scar, no physical defects or other deformities or abnormalities permanently existed.

## I.

We shall first consider the issue of whether Frisch proved his case of strict liability against Harvester and Woods by a preponderance of the evidence.

■■ A case of strict liability is proved where it is established that plaintiff's injuries resulted from a condition of or defect in the product, that the condition or defect was unreasonably dangerous and that it existed when it left the manufacturer's control. (*Suvada v. White Motor Co.* (1965), 32 Ill.2d 612, 623, 210 N.E.2d 182; *Taylor v. Carborundum Co.* (1st Dist. 1969), 107 Ill.App.2d 12, 18, 246 N.E.2d 898.) Indeed, this court has held the proof as to causation may be sufficient where the condition or defect is shown to be merely a "contributing" cause. (*Rivera v. Rockford Machine & Tool Co.* (1st Dist. 1971), 1 Ill.App.3d 641, 646, 274 N.E.2d 828.) Direct or circumstantial evidence which tends to exclude extrinsic causes establishes a *prima facie* case under strict liability, and it is unnecessary for plaintiff to disprove every cause of the injury other than the one alleged. (*Bollmeier v. Ford Motor Co.* (5th Dist. 1970), 130 Ill.App.2d 844, 851, 265 N.E.2d 212.) Contrary to Harvester's contention, it was not necessary for Frisch to have proven a specific defect caused his injuries to the exclusion of all other defects or causes. *Bollmeier*, 130 Ill.App.2d 844, 849-51.

■■ In the present case, Frisch showed he was injured while operating the tractor. Evidence corroborating the injuries resulted from an emission of gasoline from the filler neck was provided by two witnesses who viewed a flame burning from the neck and the cap extended and leaning to the left shortly after the accident. Frisch also alleged and proved through both testimony and exhibits the existence of defects in the locking mechanism of the cap and in the failures to warn potential users that pressure build-up and vibration could cause the cap to come loose and of the importance of securing the cap while the tractor is in operation. The record does not conclusively show pressure building up within the tank though temperature increase and vibration could have by themselves loosened the cap and caused the gas to spurt forth. However, we find there is sufficient evidence to show that the inadequate venting, proximity of the tank to the engine and lack of a heat shield combined with the inherent vibration combined to create a defectively designed and manufactured tractor capable of causing the injuries herein suffered.

So far as we have determined, failures to warn of dangers in operating

the product such as at issue here, have previously been recognized as defects in Illinois only in *Williams v. Brown Manufacturing Co.* (5th Dist. 1968), 93 Ill.App.2d 334, 359-64, 236 N.E.2d 125, *rev'd on other grounds* (1970), 45 Ill.2d 418, 261 N.E.2d 305. Persuasive authority has developed in various Federal cases recognizing that products otherwise not defective unaccompanied by proper warnings are covered under the theory of strict liability. (See, *e.g., Davis v. Wyeth Laboratories, Inc.* (9th Cir. 1968), 399 F.2d 121, 126-30; *Alman Brothers Farms & Feed Mill, Inc. v. Diamond Laboratories, Inc.* (5th Cir. 1971), 437 F.2d 1295, 1302-03; *Basko v. Sterling Drug, Inc.* (2nd Cir. 1969), 416 F.2d 417, 426; *Nelson v. Brunswick Corp.* (9th Cir. 1974), 503 F.2d 376, 379.) Indeed, the Ninth Circuit Court of Appeals, citing a multitude of authorities in *Nelson* (at 379, n. 4), noted a "developing national trend" to adopt such a rule. In our opinion the failures to warn (of pressure build-up and vibration and the importance of securing the cap) in the present case were shown to be and were, in fact, defects in the product. The defective product created by the failures to warn, the locking device, the inadequate venting provisions, the proximity of the engine and the tank and the lack of a heat shield was also shown to have been unreasonably dangerous, and no question exists that the defects all existed at the time of injury in substantially the same condition they did when the tractor and cap left Harvester's control. Any potentiality that the manufacturer of the cap might have been held ultimately liable was precluded by Harvester's own dismissal of its claim against the manufacturer.

■■ The only feasible cause for the incident other than the defects in the product, based on the evidence in the record, is if Frisch himself had loosened and then failed to securely tighten the cap immediately prior to the accident. Though this contingency was specifically denied by Frisch and no independent evidence exists tending to support the contention, Harvester would have been liable even in this case since the failure to warn of the importance of securing the cap was itself a defect.

As noted earlier in this opinion, the parties presented conflicting expert testimony as to the likelihood temperature could rise (causing pressure to build) and vibration could shake the tank to a sufficient degree to, of themselves, loosen the cap and cause gas to erupt forth. Frisch did, however, show sufficient defects in the tractor and cap to have established the first part of his *prima facie* case. It was uncontested that some pressure builds inside the tank due to inadequate venting and the lack of a heat shield. In our opinion these conditions in combination with the proven defects in the locking mechanism and failure to warn as well as the inherent vibration of tractor operation was adequate evidence to establish them as the cause of Frisch's injuries. Viewing the evidence as

a whole, we further find the trial court did not err in finding Frisch proved his case by a preponderance of the evidence.

## II.

We next consider whether Frisch was precluded from recovery by the doctrine of assumption of risk. Harvester urges that Frisch is precluded from any recovery by having deliberately encountered the very conditions of which he complains. Frisch contends he did not assume any risk by encountering the cap having been loose one inch on the filler neck two or three times in the two months prior to the incident.

■■ We need not reach the merits of this issue for it is clear, as this court has stated, that "assumption of risk is an affirmative defense which must be pleaded and proved by the defendant." (*Sweeney v. Matthews* (1st Dist. 1968), 94 Ill.App.2d 6, 25, 236 N.E.2d 439.) Reviewing the pleadings reveals that neither Harvester nor Woods pleaded the defense in the trial court and are thus barred from raising it in this court.

## III.

The next issue before this court is whether the trial court improperly admitted evidence so as to preclude the defendant from receiving a fair trial. Harvester contends improperly admitted evidence was relied upon by the trial court in arriving at its findings. Frisch contends no evidence was improperly admitted and that, even if any had been, competent evidence supported the finding.

## A.

■■ Harvester alleges two errors with regard to Frisch's section 60 examination of Holmberg. The first error is as to letters introduced into evidence. These letters, from the files of Harvester, involved problems encountered with fuel "spurting" from the vent hole and other aspects of venting in other Harvester tractors. In each case, however, the letters were either not hearsay because Holmberg was the author of the letters or were hearsay admitted not for the truth of the matters stated but to show notice (*Northern Trust Co. v. Moscatelli* (1st Dist. 1964), 54 Ill.App.2d 316, 333, 203 N.E.2d 447), or to impeach the credibility of the witness. (*Albertina v. Owens* (5th Dist. 1971), 3 Ill.App.3d 703, 704, 279 N.E.2d 70.) Additionally, though the evidence referred to in the letters was relevant and material to pressure problems, none of it went directly to the elements involved here, and the record fails to show this evidence provided a basis for the trial court's finding.

■■ The second error alleged is that Holmberg should not have been called as a section 60 witness since he had ceased employment with

Harvester prior to his testifying. Holmberg had been employed by Harvester for slightly over 33 years, performing engineering design, layout and detail work. Although the record is not clear regarding the calling of Holmberg under section 60, it is clear that Harvester's only objection to such an examination was based on the fact that on February 1, 1968, the day Holmberg was called, he was no longer an employee of Harvester. As we read the record Holmberg retired the day before he testified.[4] In *Bituminous Casualty Corp. v. City of Harrisburg* (4th Dist. 1942), 315 Ill.App. 243, 42 N.E.2d 971, the court held the status of the witness at the time of calling, rather than at the time the cause of action accrued, is controlling. Harvester, relying on *Bituminous*, claims it was error to permit Holmberg to be examined under section 60 because on the day he was called as a witness Holmberg was no longer employed by Harvester. The *Bituminous* court in discussing section 60 stated (at 249), "[t]he language of the statute contemplates the status of the witness, as of the time of the litigation apparently and not as of the time of the accrual of the cause of action." Section 60 applies: "Upon the trial of any case * * *."

In the instant case approximately eight years elapsed between the filing of the instant law suit and the date Holmberg was called. In fact the record shows that the actual trial of this cause commenced January 12, 1968, at which time apparently Holmberg was still employed by Harvester. In our opinion the trial court was correct in allowing Holmberg to be called as a section 60 witness since, in a protracted trial, as here, or when there is a long delay in bringing a case to trial, the purpose of section 60 could be frustrated by the adoption of defendant's theory. We find no language in section 60 or in *Bituminous* which mandates otherwise.

### B.

Harvester contends error in the admission of evidence as to unproven occurrences alleged to be similar. These occurrences involved other tractors in which a cap had allegedly come loose and fuel spurted forth and was offered to show pressure could build up to such a degree as to have caused these occurrences.

Frisch contends such evidence is proper where it tends to show the common cause of the accidents in issue is a dangerous and unsafe thing and is also admissible to show notice.

---

[4] Holmberg was called to the stand on February 1, 1968. He testified he retired "as of the 31st of last month." In a colloquy with the court concerning the right to call Holmberg under section 60, counsel for Frisch stated Holmberg was chief engineer until last night. We find this statement is uncontradicted.

■■ Upon review of this evidence we believe under the holding of this court in *Moore v. Jewel Tea Co.* (1st Dist. 1969), 116 Ill.App.2d 109, 129, 253 N.E.2d 636, this evidence is admissible to establish notice of an unreasonably dangerous condition. As this was not a jury trial, we have a right to assume, in the absence of anything in the record to suggest otherwise, that the experienced trial judge did not allow this evidence to establish the cause of the accident as Harvester suggests.

■■ Harvester also asserts it was error to allow Frisch to operate a vibrating table with a gas cap attached in the presence of the trial judge. Since this evidence was offered as a demonstration to lay the groundwork for subsequent testimony rather than as an experiment to recreate the incident, we find no error. (*Harsh v. Illinois Terminal R.R. Co.* (4th Dist. 1953), 351 Ill.App. 272, 279-80, 114 N.E.2d 901, *rev'd per curiam on other grounds* (1955), 348 U.S. 940, 99 L.Ed. 736, 75 S.Ct. 362.) The cases cited by Harvester all involved experiments intended to recreate the incident and are therefore inapplicable.

### C.

■■ Other alleged trial errors concern the form of and answers to hypothetical questions, improper questions by Frisch's attorney and "unsupported innuendo" while examining witnesses, as well as the stating of personal beliefs in the attorney's closing argument. Again our review of the incidents referred to, when viewed in light of a bench trial with a record of approximately 8,000 pages, persuades us there was no substantial error prejudicial to the rights of either Harvester or Woods.

### D.

During the examination of Frisch, his attorney stated he was not showing Frisch his income tax returns for 1965 through 1967 on the basis they were not relevant as Frisch was not claiming lost earnings for that period. Frisch, in a sworn answer to an interrogatory, claimed no work loss subsequent to July 15, 1964, as a result of his accident. In his closing argument to the trial court Frisch claimed the right to recover lost wages not only for 1965 through 1967, but for his entire remaining 33-year work expectancy in the amount of $111,320. Harvester now urges that the statement by counsel should have been stricken by the trial court, and that as the result of such statement Harvester was not permitted to cross-examine Frisch on the matter or present evidence to the contrary. Frisch in his brief urges that the remark by counsel was an inadvertent remark which cannot be categorized as the formal act required for a judicial admission.

Judicial admissions are formal acts of a party or his attorney in court,

dispensing with proof of a fact claimed to be true and is used as a substitute for legal evidence at the trial. (*Rosbottom v. Hensley* (4th Dist. 1965), 61 Ill.App.2d 198, 215, 209 N.E.2d 655; *Dursch v. Fair* (2nd Dist. 1965), 61 Ill.App.2d 273, 286, 209 N.E.2d 509.) As stated by this court in *Vincent v. Wesolowski* (1st Dist. 1967), 87 Ill.App.2d 477, 481, 232 N.E.2d 120, "[w]hat constitutes a judicial admission must be decided under the circumstances of each case * * *."

■■ In the instant case during direct examination of Frisch as to his yearly income, the following colloquy took place:

"Q. [Attorney for Frisch] All right, sir. Now your income for the years 1965, '66 and '67 have been more, not less, than what you were making in 1957—'58, rather, is that right?

A. Yes, sir.

Q. So I'm not in—I'm not going to show those income tax returns, unless Mr. Jacobs wants—I don't feel it's relevant because we're not claiming any lost earnings for that period of time.

MR. JACOBS [Attorney for Harvester]: Do you have the documents? May we see them?

MR. HOFELD: I have 1965. I don't have '66 and '67. '67 of course, would not be filled out yet, but '66 I don't have."

So far as we can tell from the record, nothing more was said about this subject until closing argument which is discussed below. When viewed under the circumstances of its assertion, we do not consider this to be that type of deliberate, formal, clear admission as to elevate it to a judicial admission. The statement was a comment concerning trial procedure related to whether to use certain income tax returns. As to the interrogatory answer by Frisch that such earnings would not be claimed, as stated by this court in *Deel v. United States Steel Corp.* (1st Dist. 1969), 105 Ill.App.2d 170, 179, 245 N.E.2d 109, answers to interrogatories are not judicial admissions.

■■ Counsel for Frisch, in his closing argument, referred to lost earnings for the years 1965, 1966 and 1967 because of his inability to resume farming.[5] At the conclusion of Frisch's closing argument, counsel for Harvester objected to Frisch's claim "about the lost income in light of the statement that no lost income was being claimed after '66, '67 * * *." The trial court then said, "I will only consider that which I think is material to this case." We think it is clear from the record that Harvester was in no manner prejudiced by these comments.

---

[5] Counsel argued if Frisch was working as a farmer in 1968 he would be making $10,040 a year compared to $7,000 yearly income as a maintenance man, resulting in a difference of approximately $3,040. Counsel further argued the lost earnings for 1965 were $4,506, for 1966, $3,492, and 1967, $3,040.

In sum, then, we find no improper admission or procedures in the court below requiring our reversal.

## IV.

Harvester contends that the damages of $125,000 were excessive, contrary to the manifest weight of the evidence and based upon improper argument and conduct of Frisch's counsel. The latter theory has already been covered in this opinion.

■■ Evidence was presented as to Frisch's loss and potential loss of income by means of income tax returns and Frisch's testimony. Frisch asserts the record established lost earnings prior to trial and future earnings expected to be lost over Frisch's remaining work expectancy combined with medical expenses amounted to $131,978. In addition to these alleged damages, counsel for Frisch cited as damages the latter's loss of ability to (1) pursue his desired profession of farming, (2) stay outdoors in heat or cold without his lips and ears cracking and bleeding or being subject to frostbite, and (3) sleep soundly due to pain. Considering Frisch's life expectancy plus the alleged income damages, Frisch sought, in total, $350,000. We think the evidence established that as a result of the defective product designed and manufactured at the instigation of and distributed by Harvester, Frisch suffered medical, economic and vocational injuries which were permanent and severe. In our opinion the record before us more than adequately demonstrates the justification for the finding in the amount of $125,000.

## V.

■■ Lastly we consider whether the finding for Woods on his counterclaim in indemnity was justified. Harvester alleges that Woods failed to satisfy his burden as indemnity-claimant of proving each of the elements of a strict liability case against Harvester. In support of its contention, Harvester cites *Suvada v. White Motor Co.* (1965), 32 Ill.2d 612, 210 N.E.2d 182, in which the plaintiff seeking indemnity was required to prove the elements of strict liability. The reason for this requirement in *Suvada,* however, was that the plaintiff had settled with the injured parties and this precluded any trial or findings as to liability. In the present case, by contrast, the elements of strict liability were clearly shown by competent evidence against both Woods and Harvester. It would be a waste of judicial and legal resources unnecessarily imposed to require Woods to separately prove these elements.

■■ The only remaining question is whether, where the *Suvada* elements have been proved, the trial court errs in finding in indemnity for an intermediate party against the manufacturer when the defects in the

product originated in the designing or manufacturing process. This court has made it clear that, while the active-passive theory of negligence does not apply to—and is indeed antithetical to—strict liability, the policy considerations behind imposing strict liability enunciated in *Suvada:*

> "[J]ustify the relief of indemnity against persons in the distributive chain who have placed a product in the stream of commerce with the knowledge of its intended use." ( *Texaco, Inc. v. McGrew Lumber Co.* (1st Dist. 1969), 117 Ill.App.2d 351, 357, 254 N.E.2d 584.)

The record makes clear that Harvester placed the defective product in the stream of commerce with knowledge of its intended use. While Woods failed to warn Frisch of the dangers of pressure and vibration and of the importance of securing the cap, this failure merely continued a defect created by Harvester. While the active-passive theory is based on fault, indemnity in strict liability presently turns on the creation of a danger to the public. Though the results of these analyses may often be the same, each derives from a different concept of legal relief. It is on the basis of the latter theory of relief and our discussion in *Texaco* that we find no error in the trial court's ruling for Woods in indemnity.

## VI.

Additionally, the court cannot help but note the extreme delay in this case between injury and relief. Undoubtedly all of the parties' counsel and the courts involved in this suit have, in some way, each contributed to this delay, but the fact remains that more than 16 years have elapsed during which time plaintiff's injuries have gone uncompensated. We know that delays of this type cause the public to lose faith in the effectiveness of the legal system. These delays compel the legal profession and the courts to make every effort to improve the speed of judicial service. As to the plaintiff Frisch, the timely resolution of this traumatic incident is undoubtedly of single importance. The long delays between an incident and trial and then in the appellate process must be eliminated. The cooperation of the trial and appellate bar must be received in order to assist the courts in speeding up the judicial process.

The judgments of the circuit court of Cook County are affirmed.

Judgments affirmed.

STAMOS and LEIGHTON, JJ., concur.