ELAINE RUBRIGHT *et al.*, Plaintiffs, *v.* CODMAN & SHURTLEFF *et al.*, Defendants.—(CODMAN & SHURTLEFF *et al.*, Third-Party Plaintiffs-Appellants, *v.* THE LAWTON COMPANY *et al.*, Third-Party Defendants-Appellees.)

First District (1st Division) No. 78-1115

Opinion filed June 16, 1980.—Rehearing denied July 28, 1980.

McKenna, Storer, Rowe, White & Farrug, of Chicago (John F. White, Robert S. Soderstrom, and James P. DeNardo, of counsel), for appellant Rockford Memorial Hospital.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Thomas F. Tobin, John T. Rank, and Daniel J. O'Connor, of counsel), for appellant Codman & Shurtleff.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (D. Kendall Griffith and Stephen R. Swofford, of counsel), for appellees Alcon Laboratories, Inc., and Dart Industries.

Mr. JUSTICE CAMPBELL delivered the opinion of the court:

This appeal arises from a suit by Elaine and Wayne Rubright for injuries suffered by Elaine on April 14, 1971. She was injured when a surgical instrument broke and a fragment of the instrument became imbedded in her back during a laminectomy operation. The Rubrights' multicount second amended complaint based in negligence, including *res ipsa loquitur*, enterprise liability, and strict products liability sought damages from: Rockford Memorial Hospital (hereinafter Rockford), the hospital where the operation occurred; Codman & Shurtleff (hereinafter Codman), the distributor of the instrument; Dr. Dennis F. Fancsali, the operating surgeon; and Rockford Clinic, Ltd., a professional corporation of which Dr. Fancsali was an agent and employee. The case proceeded against Rockford on the theory of *res ipsa loquitur* and against Codman on that theory as well as a strict liability theory.[1] The *res ipsa loquitur*

---

[1] Rockford was sued on the theory of negligence, *res ipsa loquitur* and enterprise liability and Codman on the theory of *res ipsa loquitur*, enterprise liability and strict liability. The enterprise liability counts were dismissed, however, for failure to state a cause of action and a directed verdict was granted at the close of the plaintiffs' case on the negligence counts in favor of Rockford.

counts alleged *inter alia* that the plaintiffs' injuries would not have occurred had Rockford, "exercised the degree of care required in examining the rongeur prior to its use in surgery; and/or had there not existed while the rongeur was within the control of the defendant, Codman, a condition or conditions which made the rongeur unsafe for its reasonably forseeable use considering the nature and function of the rongeur." Strict liability was alleged against Codman on the basis of certain specified design defects, failure to warn, and on the basis that "[t]he rongeur was, in other respects, unsafe for its reasonably forseeable uses."

Rockford filed a third-party indemnity action against Codman and The Lawton Company, the manufacturer of the instrument, and its successors and assigns, Alcon Laboratories, Inc., and the Lawton Company, a division of Seamless Hospital Products Company, a division of Dart Industries (hereinafter these will be collectively referred to as Lawton and individually as Alcon, Dart, and The Lawton Company). Codman also filed a third-party complaint seeking indemnification against Lawton.

The jury returned a verdict against all the defendants in the plaintiffs' original action. Verdicts were also returned in favor of Lawton as to the third-party complaints filed by Codman and Rockford and in favor of Codman in Rockford's third-party action against it. Codman and Rockford have appealed solely from the judgments in favor of Lawton and against Codman and Rockford and the denial of their post-trial motions. Each alleges error in the trial court's failure to enter a directed verdict in its favor or a judgment notwithstanding the verdict and additionally contends that certain evidentiary rulings of the trial court require a new trial on their third-party indemnity action.

The joint trial of the plaintiffs' action and the third-party actions took place over a six-week period and amassed a record of nearly 4,000 pages. Therefore, for the sake of brevity, only testimony relevant to the parties' contentions will be reviewed. Mrs. Rubright consulted Dr. Fancsali for back pain. After examining her, he diagnosed her condition as an acute herniated intervertebral disc. As this condition allowed a portion of the inner material of the disc to bulge up into her spinal canal and press on her nerve, surgery was suggested. The object of the surgery was to remove the soft center of the disc which was causing the bulge. In order to remove the disc center, a tool, known as a seven-inch straight pituitary rongeur, was used. In this type of procedure, the rongeur is inserted into the disc in a closed position and then opened to grasp the soft inner material of the disc in order to either cut it or pull it out with a plier-type action. This particular rongeur was selected for the surgery because a small instrument was needed due to the severely limited space within

which to work in Mrs. Rubright's case. Dr. Fancsali testified that he felt the rongeur break during the surgery after he started to close the jaws of the rongeur in order to grasp some of the soft center of the disc. Upon removing the rongeur and examining it, Dr. Fancsali discovered that the superior jaw or blade of the rongeur was missing. After extensive efforts to retrieve the broken fragment, Dr. Fancsali determined that the fragment was imbedded in the hard outer part of the disc and would not migrate. Consequently, he decided to leave the fragment in Mrs. Rubright, as he felt that repeated probing might cause a greater risk of harm. The fragment was subsequently removed by another physician. Dr. Fancsali testified that he examined the rongeur visually and operationally prior to surgery and it appeared in good working condition. Furthermore, he stated that he was familiar with the instrument from long usage and knew that it was not to be utilized on bone. He did not bend or twist the instrument during the operation nor misuse it in any way. He also testified that the hospital owned only two pituitary rongeurs like the subject rongeur.

Martha Parlapiano, whose duty it was to insure that surgical instruments at Rockford were properly handled, stored, cleaned, cared for, and maintained, testified that surgical instruments were inspected and examined at numerous points in the hospital: when cleaned, when selected for a case, in surgery, and before and after surgery. The inspection of a rongeur, she testified, involves a visual examination for misalignment of the jaws or anything unusual about the instrument and an operational examination to insure that it opens and closes properly. Instruments which do not pass one of the aforesaid inspections are sent to the manufacturer for repair by the head nurse or Parlapiano. Parlapiano testified, however, that in the case of the subject type of rongeur, any repairs would be made by Codman, the distributor. She further testified that the hospital records revealed at least a half dozen instances in which pituitary rongeurs, which fit the description of the subject rongeur, were repaired. She could not tell whether the subject rongeur had been repaired or how old it was. Nor did she know how many seven-inch straight pituitary rongeurs were owned by the hospital.

Robert Engler, a vice-president of Codman, testified that the subject rongeur was distributed by Codman but manufactured by Lawton. The Lawton rongeur was made of American 420 steel. He further testified that, at the time that an instrument was received from Lawton, it would be visually and operationally inspected. At this time the Lawton name was buffed off and Codman's name placed on the instrument. The rongeur was then packaged in plastic and stored. It was conceded that because of its practice of removing Lawton's name from the rongeur and because its purchase and sales records were destroyed, there was no way

to document that the rongeur was purchased from Lawton. Codman repaired instruments which it distributed according to Engler. Repairs on rongeurs included work on rongeurs which needed to be straightened or sharpened, which were sticky and did not slide, or which were cracked and broken. Codman would replace broken jaws in some instances, Engler testified, although often if a jaw were broken it wouldn't be repaired. The decision whether a particular instrument would be repaired rested solely within Codman's discretion.

Hans Jakobi testified for Lawton. He stated that Lawton did not manufacture a rongeur like the subject rongeur but rather bought them from several small, family run, "cottage industry" firms. These firms, Jakobi testified, receive German 4021 stainless steel in the rough shape of the finished product and milled them into the various component parts of the rongeur. These parts are then heat processed to produce certain specified characteristics: hardness, corrosion resistance, flexibility, and cutting ability. Lawton requires a Rockwell-C of between 42 and 46 in the stainless steel used in the manufacturing of rongeurs in order to insure the proper amount of hardness (tensile strength) and toughness or elasticity (ductile strength). Stainless steel with a Rockwell-C which exceeds 46, Jakobi testified, would be brittle and consequently would produce a rongeur which would be more apt to crack during use. Jakobi also testified that a percentage of its instruments are subjected to tests for hardness, flexibility, and dimension subsequent to the hardening process. Jakobi stated that the neck size on the blade or jaw of the 2 x 10 millimeter subject rongeur should be between .7 to 1.0 millimeters. He also concluded that the subject rongeur was manufactured prior to 1961 because it has a mirror finish and this finish was discontinued prior to 1961.

Five metallurgical experts testified with respect to the metallurgical properties of stainless steel generally and of the stainless steel used in the subject rongeur. Each had examined the rongeur and some had conducted tests on the subject rongeur or on similar rongeurs. Certain uncontested facts emerged from their testimony. First, it was agreed that the metal used in the subject rongeur was clean steel, not metallurgically defective in any way. The composition of stainless steel, according to the experts, allows a particular piece of steel to be tailored to bring out certain desired qualities by altering the heat treatment process. In the case of a seven-inch straight pituitary rongeur, the experts agreed that corrosion resistance, hardness and elasticity were necessary qualities in order to insure a good cutting edge and the ability of the instrument to plastically deform (bend) without breaking. Certain tests performed by the experts revealed that the broken blade of the subject rongeur had a Rockwell-C hardness measurement of 42½ while the mating blade was 45.

According to the experts, the hardness of stainless steel is measured by the Rockwell-C test. Hardness is directly proportional to the steel's tensile strength which indicates its ability to resist breaking by a pulling force, while its ductile strength, the ease of deformation or bending, is reversely proportional to the steel's hardness. The experts also agreed from their examination of the fracture surface that the broken blade displayed a ductile overload fracture. A ductile fracture results from a distortion or deformation of the metal.

To clarify the nature of the ductile break, the experts conducted various examinations of the subject rongeur and a variety of tests on similar rongeurs. All agreed that the break was preceded by at least one bend and that a ductile break can be produced from one to 10 or more excursions.[2] Dr. Levinson, testifying for Codman, noted that he observed only one bend in the rongeur at the fracture site but also noted that the presence of a single gross bend resulting in the fracture would probably have eliminated evidence of any other kind of break. Drs. Taussig, Rostoker and Gordon conducted further examinations and tests to determine the cause of the break. Taussig testified that upon his initial examination of the rongeur's fractured surface, he could not tell whether there had been more than one excursion. Therefore, he made a replica of the fracture so that he could examine the fracture site under the scanning electron microscope. The rongeur was too large to otherwise be placed under the microscope. From this examination he concluded that the rongeur had to have been bent and restraightened prior to the break.

Rostoker also concluded that the rongeur had to have been bent and restraightened prior to the break although on a completely different basis. Rostoker conducted operational tests on four sample rongeurs of the same type and dimension as the subject rongeur. From these tests, he found that a rongeur could not be broken by a physician performing a laminectomy on soft tissue but that it would be predisposed to failure as a result of a prior bending and straightening. Moreover, he concluded that a series of prior bendings and restraightenings could predispose a rongeur to failure under a normal operational use. Based on these tests, Rostoker concluded that the final force involved in the break was not necessarily a bend and consequently the bend evident in the subject rongeur could have been residual from a prior-existing bending and straightening operation.

Dr. Gordon conducted torque tests on three rongeurs. In his test, two rongeurs bent and one broke. The one that broke had a Rockwell-C hardness of 48 and Gordon admitted this was part of the reason it broke. Gordon also noted that a rongeur could be restraightened after a bend so that no one could detect the bend in the blade.

---

[2] An excursion refers to a bend and restraightening.

The ultimate interpretation of the undisputed facts and test results varied. Dr. Gordon, the plaintiffs' expert concluded that two defects existed in the stainless steel of the subject rongeur which contributed to the fracture of the rongeur: (1) insufficient hardness of the metal; and (2) insufficient thickness of the metal near the point of the break. Gordon testified that the steel in the rongeur was identified by an independent laboratory as American 420 stainless steel.[3] After examining the metallurgical composition of the steel in the subject rongeur, Gordon concluded that the temperature used in heat processing that steel was below that recommended by the American Society for Metals Handbook for American 420 stainless steel. Due to this fact, the Rockwell-C range of 48-53 recommended for American 420 steel was not met. Gordon did admit that softer steel is less likely to break ductilly than harder steel because it is more elastic and therefore takes more bending or distortion.

Gordon also testified that the .7 millimeter width of the neck of the cross-section of the broken blade provided a rongeur which had a strength some 20-30% less than the strength recommended by the American Society for Metals Handbook. He suggested that a 1.1 millimeter neck size would have increased the strength of the rongeur. However, such an instrument, he admitted, would require a larger opening in the patient. Gordon also testified that the defects which he identified existed in the design and manufacturing process of the rongeur.

Dr. Gordon's conclusions as to the insufficient hardness of the rongeur were disputed by Dr. Wagner, Lawton's expert. Wagner testified that hardness or tensile strength was not an important characteristic for the stainless steel to be used in a rongeur and that neither the composition of the metal nor its heat treatment contributed to the fracture of the subject rongeur. To avoid a ductile fracture like the one encountered in the subject rongeur, Wagner testified a softer steel, having greater resistance to ductile breaking but a lower Rockwell-C measurement is desirable. Wagner also testified that from his examination of the fracture he could not determine the number of excursions the subject rongeur had undergone prior to breaking. He did testify, however, that in his opinion anytime a rongeur has been bent it should not simply be restraightened. Instead, he suggested that it should be reheated or stress relieved to

---

[3] The testimony at trial appears to be in conflict over whether the steel used in the subject rongeur was American 420 steel or German 4021 steel. Engler testified that American 420 steel was used while Jakobi testified that German 4021 steel was used in the manufacturing process. The experts also differed on this issue. Gordon testified that an independent laboratory had determined that the steel was American 420, but there was other testimony that the two steels were very similar and that in fact, the German steel falls within the standards for American 420 but is generally a softer steel with a lower Rockwell-C.

eliminate the metal's "work hardening." "Work hardening" refers to the tendency of steel to become harder, more brittle and consequently easier to break at a point where a bend has been restraightened. Wagner did concur with Gordon's conclusions regarding the strength of the cross-section of the neck of the blade.

At the close of the third-party plaintiffs' evidence the third-party defendant, Lawton, moved for a directed verdict on the basis that there was no evidence that they manufactured or distributed the rongeur and that Alcon and Dart could not be held liable for the torts of The Lawton Company. This motion was reasserted at the close of all of the evidence. The court denied this motion reasoning that a successor corporation, such as Alcon, which purchases the assets, ongoing business, and good will of a predecessor corporation such as Lawton, becomes subject to the products liability of its predecessor.

At the close of all of the evidence, Codman and Rockford filed separate motions for directed verdicts against third-party defendant Lawton. These motions were reasserted in separate post-trial motions. Both parties sought that the judgments in favor of Lawton be vacated, judgments be entered notwithstanding the verdict of the jury, or for a new trial to be granted. After the trial court denied Codman's and Rockford's post-trial motions, they filed the present appeal.

■■ Before disposing of the parties' main contentions on appeal, we find it necessary to address several initial issues. First, Codman and Rockford both filed notices of appeal from the judgment in the original action and the judgment in the third-party actions. However, neither has presented argument in their briefs as to the original action, and Rockford's brief omits any arguments as to its third-party action against Codman. Moreover, each brief recites that the appeal is taken solely from the third-party action against Lawton. Therefore, each has waived its appeal from the original action, and Rockford has additionally waived its appeal from its third-party action against Codman. (Ill. Rev. Stat. 1977, ch. 110A, par. 341(e)(7).) Nor may either party question, either directly or indirectly, the propriety of the entry of the judgment in the original action. *Goodrick v. Bassick Co.* (1978), 58 Ill. App. 3d 447, 374 N.E.2d 1262; *Virginia Corp. v. Russ* (1975), 27 Ill. App. 3d 608, 327 N.E.2d 403.

We turn now to the main issues in this case. Rockford and Codman contend that they were entitled to a judgment against Lawton as a matter of law. As support for this contention, each places reliance upon the legal doctrine that the user, seller, or distributor of an unreasonably dangerous product may seek indemnity against the manufacturer of the product, or restated, that a party may look up the chain of distribution of a product for indemnity. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182; *Frisch v. International Harvester Co.* (1975), 33 Ill. App. 3d

507, 338 N.E.2d 90; *St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.* (1973), 12 Ill. App. 3d 165, 298 N.E.2d 289.) Lawton does not refute this doctrine but merely denies that a manufacturer is automatically required to indemnify a distributor. Rather, Lawton argues that the indemnity plaintiff must carry the burden of proving the necessary elements of a strict liability action against the indemnity defendant and therefore may not obtain indemnity merely because an indemnity defendant was a predecessor in the chain of distribution of the product involved in the injury. *Sears Roebuck & Co. v. Employers Mutual Liability Insurance Co.* (1972), 6 Ill. App. 3d 10, 284 N.E.2d 386.

Because of the different legal theories upon which the plaintiffs proceeded against Codman and Rockford and their different positions in the chain of distribution, we will consider the contentions of each party separately. Codman asserts that it was only an intermediary in the chain of distribution of the subject rongeur. It further asserts that, as it sold the rongeur to Rockford unaltered from the condition of the rongeur when it left Lawton's control, any defects which existed at the time of the manufacture of the rongeur should be borne by Lawton as Codman's predecessor in the chain of distribution. Codman points to the testimony of Dr. Gordon, the plaintiffs' expert, that the rongeur had two design defects which caused the fracture and his testimony that these defects occurred in the design and manufacture of the product, as proof that the rongeur was unreasonably dangerous at the time it left Lawton. Based on this evidence, Codman argues that the jury's verdict, even when viewed most favorably to the third-party defendant, would not permit a verdict to stand under the *Pedrick* standard. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) We do not agree.

From our review of the record, we find that the jury could have found that Codman failed to prove that a defective condition existed in the rongeur at the time it left Lawton. While Dr. Gordon did state that it was his opinion that the hardness (Rockwell-C) of the rongeur and the width of the cross-section of the neck of the blade of the rongeur were both inadequate and that these defects proximately caused the fracture of the subject rongeur and Mrs. Rubright's consequent injuries, other testimony by Gordon acted to weaken this testimony. Gordon admitted, for instance, that while it was his opinion that the cross-section of the neck of the blade of the subject rongeur would have been stronger at a 1.1 millimeter width, such a change in the rongeur would have meant an increase in the size of the instrument and consequently in the opening required to be made for a laminectomy patient. In the Rubright case, this increase would have prevented Dr. Fancsali from using the subject rongeur. Dr. Fancsali testified that he selected the seven-inch pituitary rongeur for Mrs. Rubright's surgery because her condition necessitated

the utilization of a small surgical instrument of this rongeur's size. He emphasized that the working area in Mrs. Rubright was 50% smaller than that which was usual in the normal laminectomy patient. Moreover, there was no evidence that the neck on a rongeur had to be a certain minimum width in order to be safe. Accordingly, the jury could have concluded that despite the consequent loss of strength in the smaller neck, only the smaller neck could have been utilized in this case.

■■ As to the defective hardness of the rongeur, Gordon testified that steel within Gordon's recommended 48-53 Rockwell-C has greater tensile strength but less ductile strength and therefore is more likely to break under a twisting or bending force. Moreover, Gordon's torque tests with rongeurs having Rockwell-C measurements of 42, 45, and 48 resulted in the bending of the two rongeurs with the lower Rockwell-C measurements but the breakage of the rongeur with the 48 Rockwell-C. From this testimony it would be possible for the jury to conclude that the lower hardness of the rongeur aided its ductile strength and that therefore the steel was the proper hardness for use as a rongeur and that harder steel would have been improper. The credibility of Gordon, as a witness, was for the jury to determine as fact finder. (*Haag Brothers, Inc. v. Artex International, Inc.* (1978), 60 Ill. App. 3d 141, 376 N.E.2d 636; *Murray v. Kleen Leen, Inc.* (1976), 41 Ill. App. 3d 436, 354 N.E.2d 415.) It is not appropriate for this court on review to conclude that Gordon's opinion that two design defects existed should be given greater weight than his subsequent testimony and his own test results.

Codman argues that any verdict against them logically required a finding of liability against Lawton in the third-party action because the plaintiffs' case against it was exclusively based on design defect. From this argument, it is clear that it is Codman's position that the jury must have found Gordon's testimony as to design defects credible because otherwise it would not have found Codman liable in the original action. We do not agree. The trial record includes sufficient evidence to have allowed the jury to conclude that Lawton's design and manufacture of the rongeur was not defective but that the condition of the rongeur subsequent to Codman's repair was unreasonably dangerous. Rockford's expert testified that the rongeur had to have been bent and restraightened prior to the break based on his examination of a replica of the fracture surface of the broken blade. The testimony of Robert Engler, a vice-president of Codman, and of Martha Parlapiano, the Rockford nurse in charge of surgical instruments, established that any Codman rongeur which had been bent or damaged in any way would have been sent to Codman for repairs. Indeed, the evidence revealed that during the year and a half prior to the accident, rongeurs similar to the subject rongeur had been repaired half a dozen times. Codman would determine if a rongeur could

be repaired and if it could would make the repair and then redeliver the repaired rongeur to Rockford. Additionally, Dr. Fancsali's expert, Rostoker, testified that he conducted tests to determine whether a rongeur could be predisposed to break by bending and restraightening. He concluded that this type of rongeur could not be broken by normal operation on the soft tissue of the disc, however, it could be predisposed to break by prior bending. Dr. Fancsali testified that he knew it was improper to utilize the rongeur on the hard outer surface of the disc and that he had not done so in this instance. From this evidence the jury could have concluded that Codman repaired the subject rongeur by restraightening it and that after its repair the rongeur was in an unreasonably dangerous condition, predisposed to break.

■■ Both Codman and Rockford assert that the trial court erred in allowing Dr. Rostoker to testify concerning the effect of repeated bendings and straightenings on seven-inch straight pituitary rongeurs because there was no evidence that the subject rongeur was repaired. We find this argument lacking in merit. First, this argument represents an attempt by Codman and Rockford to indirectly appeal from the original action although they have specifically limited their appeal to the judgment in the third-party action for Lawton. (*Goodrick v. Bassick Co.* (1978), 58 Ill. App. 3d 447, 374 N.E.2d 1262; *Virginia Corp. v. Russ* (1975), 27 Ill. App. 3d 608, 327 N.E.2d 403.) If the admission of Dr. Rostoker's testimony was erroneous, such an error would have had to have been raised in an appeal of the original action. It is asserted that as Rostoker's expert testimony constituted circumstantial evidence as to the cause of the failure of the rongeur, his testimony was improper without proof of a prior repair. The record, however, does contain evidence of repair in Dr. Taussig's testimony that his examination of the rongeur revealed the rongeur had been bent and restraightened prior to the break. As this testimony constituted evidence of repair, the trial court was correct in allowing Rostoker's expert testimony. The testimony was based on facts in evidence (compare *Theesfeld v. Eilers* (1970), 122 Ill. App. 2d 97, 258 N.E.2d 39, with *Butler v. Palm* (1962), 36 Ill. App. 2d 351, 184 N.E.2d 633; 18 Ill. L. & Prac. *Evidence* §329 (1956)), and the facts underlying the circumstantial evidence was proven, not presumed. *Hocker v. O'Klock* (1958), 16 Ill. App. 2d 414, 148 N.E.2d 618.

● 4 Codman and Rockford claim that the jury could not have found the rongeur unreasonably dangerous based on its repair rather than its design because: (1) repair was not an issue in this case; (2) no allegation of defective maintenance or repair was raised in the complaint; and (3) only design and manufacturing defects were included in the instructions to the jury. While our reading of the plaintiffs' complaint does not reveal a specific allegation that the rongeur was defective based on Codman's

repair of the rongeur, the complaint did allege that "the rongeur was, in other respects, unsafe for its reasonably forseeable uses." The instructions to the jury also include this allegation. Moreover, the complaint did allege that the rongeur might have been repaired and if repaired was repaired by Codman. Although Codman denied both of these allegations in their answer, circumstantial evidence at the trial, as already noted, does support the jury's verdict that Codman did repair the rongeur. Circumstantial evidence may be used to establish the elements of a strict liability action but it must exclude other extrinsic causes. *Vuletich v. Alivotvodic* (1979), 73 Ill. App. 3d 927, 392 N.E.2d 663; *St. Paul Fire & Marine Insurance v. Michelin Tire Corp.* (1973), 12 Ill. App. 3d 165, 298 N.E.2d 289. See generally 18 Ill. L. & Prac. *Evidence* §342 (1956).

■■ Even assuming arguendo that the plaintiff's circumstantial evidence did not sufficiently establish an unreasonably defective condition in the rongeur, the evidence of repair does show that the condition of the rongeur was altered from the time it left Lawton's possession. Therefore, Rockford and Codman did not meet their burden of proof in the third-party action. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182; *St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.* (1973), 12 Ill. App. 3d 165, 298 N.E.2d 289.) Codman argues, citing *Frisch v. International Harvester Co.* (1975), 33 Ill. App. 3d 507, 338 N.E.2d 90, that, where a third-party action is tried with the original action, the third-party plaintiff need not prove up the case against the third-party defendant. While we think that *Frisch* would be controlling and the third-party plaintiffs' burden of proof met, if the plaintiffs had proven a design defect originating from the manufacturer, the jury did not conclude that the evidence proved a design defect. Accordingly, the third-party plaintiffs had the burden to prove every element of the strict liability action against the third-party defendant in order to prevail. Based on evidence in the record that the rongeur was altered after it left Lawton, we cannot say that the trial court erred in denying Codman's motions for directed verdict or judgment notwithstanding the verdict. In view of the foregoing, we find it unnecessary to consider whether the jury could have found against Codman on the *res ipsa loquitur* count and for Lawton in the third-party action.

■■ Codman's final argument which Rockford has adopted pertains to the admission of the testimony of Hans Jakobi for Lawton. Codman initially argues that Jakobi should not have been allowed to testify for Lawton because his identity was not disclosed prior to trial as required by Supreme Court Rule 201(b)(1). (Ill. Rev. Stat. 1977, ch. 110A, par. 201(b)(1).) It was within the discretion of the trial court whether to let Jakobi testify. (*Anderson v. City of Chicago* (1975), 29 Ill. App. 3d 971, 331 N.E.2d 243; *Smith v. Realcoa Construction Co.* (1973), 13 Ill. App. 3d

254, 300 N.E.2d 855.) We do not think that under the circumstances there was an abuse of this discretion. The trial court offered time to allow the parties to depose Jakobi prior to testifying but this offer was rejected. Moreover, Lawton's counsel explained that Jakobi's testimony became relevant as a foundation for its expert witness' testimony only after the plaintiff's expert, Gordon, testified. Therefore, counsel urged that no bad faith was evident. Codman and Rockford have not shown how they were prejudiced by Jakobi's testimony. (*Anderson v. City of Chicago.*) Accordingly, we find no error in the trial court's determination that Jakobi be allowed to testify.

Nor do we find any merit to Codman's argument that the trial court erred in allowing Jakobi to give expert testimony and to testify as to Lawton's due care in testing the rongeur. The trial court, in ruling that Jakobi could testify, specifically restricted his testimony to a recitation and explanation of the rongeur's manufacturing process and what was sought to be achieved by that process. The trial court also restricted Jakobi from giving expert testimony. From our review of the record, we find that Jakobi's testimony did not violate these restrictions. Specifically, the testimony which Codman asserts constituted testimony of due care, was admitted as part of Jakobi's explanation of the manufacturing process. We do not think that this evidence prejudiced the jury because the alleged defects to which Codman refers were design oriented. As the rongeur fell within the parameters of Lawton's standards, as testified to by Jakobi, and the rongeur was not defective in the sense of being impure, the testimony regarding quality control buttressed the very design features of which Codman and Rockford complain. Accordingly, we find that even if the quality control evidence went beyond the bounds of that relevant to establish the rongeur's manufacturing process, such evidence was not prejudicial. It is well established that a decision will not be reversed on appeal where the alleged error was not prejudicial to the appellant's case. *Swenson v. Miller Builders, Inc.* (1979), 74 Ill. App. 3d 75, 392 N.E.2d 628.

We turn next to Rockford's contentions. The plaintiffs' recovery against Rockford was based totally on a *res ipsa loquitur* allegation that the rongeur was in Rockford's care at the time of the surgery and that the injury to the plaintiff would not have occurred but for Rockford's failure to care for and maintain the rongeur and its failure to adequately examine the rongeur prior to surgery. Rockford asserts as did Codman that Lawton owed it a duty of indemnification as a matter of law. There was no evidence that Rockford altered or changed the rongeur in any way other than by placing its name on all rongeurs shortly after they were received from Codman. Moreover, the evidence established that Rockford examined the rongeur several times prior to surgery and failed

to detect any defective condition in the rongeur. Several experts testified that any prior bending and restraightening of the rongeur would not have been detectable by a visual examination of the rongeur. From this testimony, it would not appear that Rockford had been negligent in failing to discover the unreasonably dangerous condition of the rongeur from its examination. Rockford asserts that even if it were found to be negligent under *res ipsa loquitur*, such negligence would not bar its recovery against a party who was strictly liable. (*Liberty Mutual Insurance Co. v. Williams Machine & Tool Co.* (1975), 62 Ill. 2d 77, 338 N.E.2d 857; *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182; *St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.* (1973), 12 Ill. App. 3d 165, 298 N.E.2d 289; *Texaco, Inc. v. McGrew Lumber Co.* (1969), 117 Ill. App. 2d 351, 254 N.E.2d 584.) We find ample support for this proposition of law in the cases relied upon by Rockford.

Rockford, however, has placed itself in an untenable position. Because it has chosen to appeal only the judgment for the nonliable manufacturer, Lawton, but not from its adverse judgment in favor of the strictly liable distributor, Codman, it can't look up the chain of distribution for indemnification. From our review of the record, and our findings in this appeal, we find that the trial court's denial of Rockford's motion for a directed verdict and a judgment notwithstanding the verdict was proper as to Lawton. As we have noted, the propriety of the trial court's decisions as to these motions by Rockford against Codman are not before us.

In view of the jury's verdict and our decision in this appeal, we do not find it necessary to reach Alcon's and Dart's contention in their joint brief that they could not be held liable for The Lawton Company's torts. We also find it unnecessary to consider whether, under section 25 of the Civil Practice Act, Lawton as third-party defendant could urge in its defense any matter which the third-party plaintiffs could have relied on in their defense of the principal action.

For the foregoing reasons, the judgment of the circuit court of Cook County in favor of Lawton as third-party defendant is affirmed as to both third-party plaintiffs.

Judgment affirmed.

McGLOON and O'CONNOR, JJ., concur.